EL PUEBLO DE PUERTO RICO, apelado, *v.* PABLO S. CRUZ CORREA, acusado y apelante.

*Número:* CR-87-39          *Resuelto:* 11 de mayo de 1988

*Cándida Valdespino Zapata,* abogada del apelante; *Rose Mary Corchado Lorent, Procuradora General Auxiliar,* abogada de El Pueblo.

EL JUEZ ASOCIADO SEÑOR REBOLLO LÓPEZ emitió la opinión del Tribunal.

El *mero hecho* de sorprender a un intruso escalando nuestro hogar, ¿constituye una circunstancia que produce en

una persona común y corriente un estado tal de cólera que requiera, *de manera automática y mandatoria,* que un tribunal de instancia imparta instrucciones al jurado sobre el delito de homicidio voluntario en un proceso que se sigue contra el acusado por el delito de asesinato?

■ Contestamos en la negativa; esto es, resolvemos que aun cuando la santidad e integridad del hogar es de gran importancia y envergadura para los seres humanos, la cuestión de si su violación per se causa o no ese estado anímico de súbita cólera que a su vez propicia una actuación impulsiva e irreflexiva en la persona es materia para ser dilucidada *conforme a los hechos específicos de cada caso en particular.*

■ Resolvemos, en adición, que a la luz de la norma anteriormente expuesta y dados los hechos particulares y específicos del presente caso, no erró el tribunal de instancia al negarse a transmitir al jurado una instrucción sobre el delito de homicidio voluntario.

I

El Ministerio Fiscal radicó ante el Tribunal Superior de Puerto Rico, Sala de Ponce, acusaciones por los delitos de asesinato en segundo grado[1] y por infracción al Art. 6 de la Ley de Armas de Puerto Rico, 25 L.P.R.A. sec. 416, contra el aquí apelante Pablo S. Cruz Correa por hechos alegadamente ocurridos el día 2 de agosto de 1986 en los cuales resultara muerto un joven de diez y siete (17) años de edad de nombre Fernando Luis Quiñones c/p "Nandito".

El apelante fue sometido a juicio solicitando ser juzgado por doce (12) de sus conciudadanos. Dicho jurado tuvo que ser disuelto al no poder llegar a veredicto alguno respecto a ninguno de los dos (2) pliegos acusatorios radicados. Cele-

---

[1] En grado de reincidencia.

brado un segundo proceso, los señores del jurado que intervinieron en el mismo como "juzgador de los hechos" rindieron veredicto condenatorio por los dos (2) delitos según imputados. Como consecuencia de ello, el Tribunal Superior de Puerto Rico, Sala de Ponce, condenó al apelante Cruz Correa a sufrir penas de reclusión, a ser servidas concurrentemente entre sí, de "diez y ocho (18) años de presidio más nueve (9) años de reincidencia" (sentencia apelada, pág. 1) en el caso de asesinato en segundo grado y de dos (2) años en el caso por infracción al Art. 6 de la Ley de Armas de Puerto Rico, *supra*.

Inconforme, el apelante acudió ante este Tribunal imputándole al tribunal de instancia la supuesta comisión de dos (2) errores, a saber:

A) No se dió instrucciones al jurado sobre el delito de homicidio. Las mismas fueron solicitadas por la defensa y denegadas por el Hon. Juez.

B) Al encontrar culpable al acusado, no hubiéndose [*sic*] probado su culpabilidad más allá de duda razonable. Alegato del apelante, pág. 10.

Procede que se señale que, luego de que se radicara el recurso de apelación ante este Tribunal, el foro de instancia, mediante resolución de fecha 15 de junio de 1987 y previa vista al efecto, le concedió al apelante fianza en apelación.

## II

La prueba del Ministerio Fiscal, respecto a la ocurrencia en sí de los hechos, consistió del testimonio de tres (3) testigos. Todos escucharon en la noche del 2 de agosto de 1986 varias detonaciones de arma de fuego.

La Sra. Belén Ayala Santiago —*quien residía para la fecha de los hechos en una casa contigua, por la parte trasera, a la del apelante*— testificó, en síntesis, a los efectos de que esa noche pudo oír la voz de un "hombre mayor" que amenazaba con matar a otra persona "para que no lo hagas

más" (alegato del apelante, pág. 2); que seguidamente pudo percibir la voz de un "muchacho" *suplicando que no lo mataran*; que luego de oír por segunda ocasión prácticamente el mismo intercambio de palabras anteriormente expresadas, escuchó un disparo de revólver; que oyó nuevamente al "muchacho" *suplicando y llorando* por su vida, luego de lo cual escuchó un segundo disparo y, luego de una pausa, una tercera detonación de arma de fuego, y que no puede decir o precisar a qué personas pertenecían dichas voces *pero que las mismas provenían de la parte trasera de su casa, esto es, de donde vivía el apelante.*

Los restantes dos (2) testigos "de los hechos" —el Sr. Demsey Almodóvar Meléndez y el joven Samuel Rivera Martínez, vecinos igualmente del apelante— testificaron, en síntesis, que esa noche, luego de escuchar varias detonaciones de arma de fuego salieron a la calle pudiendo observar al apelante frente a su casa con una arma de fuego en sus manos; que éste les expresó que había sorprendido al occiso robando en su casa, y que al éste intentar darle con un bate, él le había disparado. El testigo Almodóvar Meléndez testificó, en adición, que al rato de haber sostenido la conversación con el apelante pudo observar a éste arrastrando el cuerpo del occiso hacia la calle. Declaró, por último, el referido testigo que él tenía conocimiento personal de que el occiso "olía *thinner*" y que el apelante le proporcionaba dicho material a aquél.

El agente Luis A. Martínez Bodón, perteneciente al Cuerpo de Investigaciones Criminales de la Policía de Puerto Rico, declaró, en síntesis, que entrevistó al apelante y que éste, luego de él hacerle las advertencias de rigor, le informó que había matado al occiso porque éste se había metido en su casa. Declaró, en adición, dicho agente del orden público que pudo percatarse que la muerte del occiso no había ocurrido en el lugar donde apareció el cadáver debido a

que no había sangre en dicho lugar y que se notaba que el cadáver había sido arrastrado.

Por el Ministerio Público, en adición, declaró la patóloga forense Dra. Yocasta Brugal. Testificó dicho facultativo médico, en síntesis, que el cadáver del occiso mostraba abrasiones consistentes con haber sido arrastrado el mismo y que dicho cadáver había recibido tres (3) impactos de bala; que en su opinión la trayectoria de las referidas heridas de bala —una de las cuales fracturó el húmero en el hombro izquierdo— eran de "arriba hacia abajo" (alegato del apelante, pág. 6) y que las mismas eran compatibles con la situación en que el occiso estuviera en un plano inferior a la persona que le hizo los disparos, probablemente de rodillas o en cuclillas, y que no podía especificar cuál de las heridas ocurrió primero.

Por la defensa testificó el propio apelante. Reproducimos su declaración según ésta surge de la exposición narrativa de la prueba que certificara como correcta el tribunal de instancia:

Declaró que esa noche se encomendó para traer las bestias a su casa y cuando regresó escuchó un ruido en la casa. Que siempre dejaba su casa asegurada, dejó el portón junto y se fue a buscar [las bestias. Luego de traer la tercera bestia, al ir a] buscar agua escuchó ruido, para la parte de la casa vieja. Se acercó por la parte de la escalera y vi[o] a una persona arriba. Que le dijo: "[m]ira ha[z]me el favor, no busques problemas". Que el sujeto le dice "[o]lvídese de eso". Que se sintió sorprendido, se movió a la escalera, escuchó ruido en el piso, volvió a ver al sujeto y le dijo: "bájate de ahí". Que en ese momento sabía que era Nandito. Que subió a mitad de la escalera y frente a la mesa del comedor vi[o] que Nandito levantó algo y le dijo: "[v]iejo hijo de puta, esto es lo que tengo para ti". Que le disparó a la pierna. Que le hizo un segundo disparo. Nandito se dobló un poco y le hizo un tercer disparo. En el contrainterrogatorio admite que los disparos los hizo a distancia de tres pies. Que el revólver lo tenía hacía algún tiempo y ese día se lo llevó para su seguridad. Que no sabe el nombre de la persona

a quien se lo compró, pero que ésta se fue para los Estados Unidos, pero no sabe la dirección. Que votó el revólver no sabe a d[ó]nde. Que no tenía licencia para tener o portar armas. Que no le dijo nada a los vecinos. Que sacó el cadáver de la casa y lo arrastró hacia la calle al otro lado del parque. Que no encontró a nadie en la calle, ni en la vecindad para pedir ayuda. Que no notificó a la Policía por falta de teléfono y transportación. Tampoco pudo comunicarse con nadie, ni le entregó bate alguno. Que al otro día vi[o] un bate en el patio de la casa. Que tan pronto sacó el cadáver, hizo limpieza, se bañó y se acostó a dormir hasta el día siguiente. Que siguió trabajando, no le dijo nada a sus compañeros de trabajo. Que no escuchó a la Policía ni a nadie cuando investigaba al momento de aparecer el cadáver de Fernando Luis Quiñones frente a su casa al cruzar la calle. Que no habló con Demsey Almodóvar, n[i] con Samuelito sobre los hechos. Niega haber hablado con don Máximo Quiñones, padre del occiso, [a quien al día siguiente de la muerte se le acercó y le preguntó si ya habían cogido al asesino]. Alegato del apelante, págs. 8–9.

Terminado el desfile de la prueba, el apelante solicitó del tribunal de instancia que —en adición a las instrucciones correspondientes sobre el delito imputado de asesinato en segundo grado y la de absolución por haber actuado el apelante en legítima defensa de su vida y/o morada— instruyera a los señores del jurado sobre la alternativa de un veredicto por el delito de homicidio voluntario. El tribunal de instancia, no obstante transmitir al jurado la instrucción correspondiente a legítima defensa, se negó a transmitir instrucción alguna respecto al delito de homicidio voluntario por entender que la prueba desfilada no lo justificaba.

## III

■ No debe perderse de vista que el derecho constitucional a juicio por jurado que tiene en nuestra jurisdicción toda persona que es acusada de la supuesta comisión de delito grave —e inclusive, en ciertas circunstancias, de delito menos grave— necesariamente implica y conlleva que ese

jurado será el que actúe en el proceso como "juzgador de los hechos". Ello significa que será ese jurado el que tenga la "última palabra" no sólo en cuanto a la culpabilidad o inocencia del imputado del delito sino que será el que determine — en caso de entender que el acusado incurrió en responsabilidad en relación con los hechos que se le imputan— el delito en específico, o el grado del mismo, por el cual éste debe responderle a la sociedad.

■    Ello, naturalmente, requiere que el jurado sea correctamente instruido por el juez que preside el proceso. Debido a todo lo anteriormente expresado es que nuestro ordenamiento tiene como principio rector —según lo expresáramos en *Pueblo v. González Colón*, 110 D.P.R. 812, 815 (1981)— que "las instrucciones al jurado deben cubrir, *si la prueba lo justifica*, no sólo los elementos de delitos inferiores al delito imputado o comprendido dentro de éste, sino también los elementos esenciales de las defensas levantadas por el acusado, así como los puntos de derecho que bajo cualquier teoría razonable puedan estar presentes en las deliberaciones, *aunque la prueba de defensa sea débil, inconsistente o de dudosa credibilidad*". (Énfasis suplido.)

Sobre la procedencia, en específico, de una instrucción sobre el delito de homicidio voluntario en un proceso seguido contra un acusado por el delito de asesinato, resolvimos en *Pueblo v. Galarza*, 71 D.P.R. 557, 561 (1950), que:

> No es necesario que la prueba de homicidio resulte incontrovertida o concluyente sobre la cuestión; mientras haya algún indicio de prueba a ese efecto, el jurado es el llamado a aquilatar la misma. De haber alguna evidencia tendiente a demostrar un estado de hechos que haga caer el caso dentro de la definición de homicidio voluntario, es al jurado que incumbe determinar si tal prueba es cierta o no, y si la misma demuestra que el delito cometido fue homicidio voluntario y no asesinato. (Traducción nuestra.) *Stevenson v. United States*, 162 U.S. 313, 314 (1895).

■ En otras palabras —y sobre ello no debe existir duda alguna— no importa cuán abrumadora pueda parecerle al juez que preside el proceso la prueba sobre asesinato, mientras haya *alguna prueba* que tienda a indicar la posibilidad de un homicidio, ese juez viene obligado a transmitirle al jurado las instrucciones pertinentes sobre el referido delito y es al jurado a quien le corresponde aquilatar dicha prueba y determinar el delito por el cual debe responder el acusado. *Pueblo v. Galarza,* ante; *Pueblo v. González Colón,* ante.

A base de los anteriores principios, sostiene el apelante que el tribunal de instancia cometió error —el cual amerita la revocación de las sentencias apeladas— al negarse a transmitir a los señores del jurado la instrucción sobre el delito de homicidio voluntario. Argumenta el apelante que en el presente caso ello era *mandatorio* por cuanto la prueba lo que demostró fue que él mató al sospechoso *al sorprenderlo robando o escalando su casa.*(²) Como podemos notar, la contención del apelante es a los efectos de que el *mero hecho* de sorprender a una persona escalando el hogar de uno "causa" per se en ésta el "arrebato de cólera" de que habla el Código Penal de Puerto Rico en su Art. 85 (33 L.P.R.A. sec. 4004). No tiene razón; veamos por qué.

## IV

Como es sabido, dispone el citado Art. 85 del Código Penal, en lo pertinente, que será culpable del delito de homicidio voluntario toda "persona que matare a otra en ocasión de súbita pendencia o arrebato de cólera". 33 L.P.R.A. sec. 4004.

Resumiendo, principalmente, nuestra jurisprudencia interpretativa de la citada disposición legal, la Lcda. Dora Nevares-Muñiz —en su libro *Código Penal de Puerto Rico,*

---

(²) Véase alegato del apelante, pág. 13.

*revisado y comentado*, Hato Rey, Rev. C. Abo. P.R., 1986, págs. 144-145— nos informa que:

Los elementos del delito son: dar muerte a un ser humano, a consecuencia de una pendencia súbita o de un arrebato de cólera, causado por una provocación adecuada de parte de la víctima. *Pueblo* v. *Sulman*, 103 D.P.R. 429 (1975). Se trata de un acto intencional e ilegal que causa una muerte pero por existir circunstancias atenuantes la calificación del delito y la pena varían para beneficio del acusado. La circunstancia atenuante consiste de que el acto del acusado fue una *reacción irreflexiva, pasional, súbita e inmediata*, provocada por la víctima u otra persona actuando con ésta. *Pueblo* v. *Castro García*, 110 D.P.R. 644, 647 (1981) (sentencia) (Rigau, disidente).

El homicidio presupone una persona ordinaria que por la *cólera, pendencia, o emoción violenta y súbita, causada por una provocación adecuada, pierde el equilibrio y dominio de sí misma*. Se excluye, por tanto, al ebrio, al adicto y al loco. *Pueblo* v. *Belmonte Colón*, 106 D.P.R. 82 (1977).

*En la modalidad del homicidio por arrebato de cólera se requiere una provocación capaz de lograr una reacción violenta, intencional, pero no calculada, ni preconcebida, en el hombre prudente y razonable*. En cambio, en la modalidad de la súbita pendencia, al remitir a su origen histórico de pelea súbita, no reflexiva ni premeditada, no necesariamente requiere una provocación previa. Basta demostrar la existencia de una pelea súbita, a lo cual se entra sin la intención previa de matar o de causar grave daño corporal. Véase, LA FAVE & SCOTT, 574; PERKINS & BOYCE 88-91; *Pueblo* v. *Gelpí*, 63 D.P.R. 517 (1944); *Pueblo* v. *González Ruiz*, 90 D.P.R. 580 (1964); *Pueblo* v. *González Colón*, 110 D.P.R. 812 (1981). (Énfasis suplido.)

No tenemos duda alguna sobre el hecho de que para la inmensa mayoría de nuestros conciudadanos el "hogar" constituye uno de los valores más preciados de su vida; lugar donde no sólo ese ser humano busca, y consigue, la serenidad espiritual y física que necesita su ser para poder continuar adelante luego de un pesado día de trabajo, sino que el

mismo constituye el retiro que es símbolo de, y atesora, lo más íntimo y sagrado de su familia.

Tampoco albergamos duda alguna de que en la gran mayoría de los casos en que ese ciudadano prudente y razonable arriba a su hogar y se enfrenta a la triste y desafortunada experiencia de encontrarse con un intruso que ha violado en la forma más despreciable posible ese oasis físico y espiritual, el mismo experimenta tal furia o arrebato de cólera que le puede llevar a la reacción violenta, impensada y funesta de quitarle la vida a otro ser humano.

Dicha reacción, sin embargo, necesariamente no es experimentada por *todos* nuestros conciudadanos. Las personas, como es sabido, reaccionan de distinta forma y manera ante una misma situación de hechos. Es por ello que no podemos adoptar, como pretende la representación legal del apelante que lo hagamos, una norma a los efectos de que en *todo* caso de esta naturaleza los tribunales de instancia vienen en la obligación de transmitirle a las damas y caballeros del jurado las instrucciones pertinentes al delito de homicidio voluntario.

■ Los señores jueces de instancia deberán determinar la procedencia de dicha instrucción en esta clase de situaciones de acuerdo con la norma general vigente en nuestra jurisdicción en relación con esta materia; esto es, conforme a los hechos específicos de cada caso en particular, viniendo obligados a transmitir la instrucción sobre el delito de homicido voluntario cuando la prueba presentada —no importa lo débil que ésta sea— así lo justifique. *Pueblo v. González Colón*, ante; *Pueblo v. Galarza*, ante.

## V

El mejor ejemplo de todo lo anteriormente expresado lo constituye, precisamente, el caso que ocupa nuestra atención. Un análisis sereno y objetivo de toda la prueba que

desfilara ante el tribunal de instancia nos convence de que la actuación del apelante, al disparar contra el occiso, no se debió a una reacción violenta, impensada e irreflexiva, esto es, a un súbito arrebato de cólera. Por el contrario, somos del criterio que la prueba lo que demuestra es que el apelante mató al sospechoso en una forma fría y calculada; no habiéndose presentado prueba alguna que justificara u obligara al foro de instancia a transmitir al jurado la instrucción denegada. Veamos.

En primer lugar, tenemos la declaración prestada por la patóloga forense. Declaró la doctora Brugal que las heridas de bala que presentaba el cuerpo del occiso eran de "arriba hacia abajo", compatibles con la situación en que la víctima estuviera de rodillas o en cuclillas al recibir las mismas.

Ello corrobora plenamente el testimonio prestado por la vecina inmediata del apelante, la señora Ayala Santiago. Dicha testigo relata y describe una situación verdaderamente impresionante donde el sospechoso llora y suplica por su vida antes de, y durante, los tres (3) disparos de revólver que le hiciera el apelante.

Como si lo anteriormente señalado fuera poco, contamos con la propia declaración del apelante, la cual se encarga de disipar cualquier duda sobre la improcedencia de la instrucción solicitada por la defensa. De acuerdo con su propia declaración, el apelante no experimentó coraje alguno al percatarse de la presencia del "intruso" en su hogar. Su única reacción, en sus propias palabras, *fue que "se sintió sorprendido"*. Sin inmutarse, el apelante fue al encuentro del occiso, a quien conocía, procediendo a dispararle en tres (3) ocasiones. Debe recordarse que, inclusive, hay prueba de la cual se puede razonablemente inferir que no era extraño el hecho de que el occiso se encontrara en casa del apelante; hubo prueba de que éste le proporcionaba *thinner* a aquél. La única instrucción que en realidad se justificaba que el tribunal le transmitiera al jurado a base del testimonio que

prestara el apelante en corte abierta es precisamente la que el referido foro le transmitió, la de defensa propia. Como hemos visto, el jurado rechazó dicha teoría; no cometió error al así actuar, ya que la prueba a esos efectos fue extremadamente débil.

## VI

Lo anteriormente expresado dispone igualmente del segundo señalamiento de error. Ello es así ya que mediante el mismo lo que el apelante plantea es que "la prueba desfilada crea serias dudas respecto a la culpabilidad del acusado entre el delito de Homicidio Voluntario y el Asesinato en Segundo Grado". Alegato del apelante, pág. 16. Como hemos visto, la prueba que obra en autos lo que demuestra, más allá de duda razonable, es la comisión de un delito de asesinato.

*Se dictará sentencia confirmatoria.*

Los Jueces Asociados Señores Hernández Denton y Alonso Alonso concurren con el resultado sin opinión escrita.