*424 Opinión disidente emitida por el
Juez Asociado Señor Rivera Pérez, a la que se une la Jueza Asociada Señora Fiol Matta.
La Mayoría concluye que el Tribunal de Primera Instancia actuó correctamente al negarse a impartirle al Jurado una instrucción sobre el delito de homicidio voluntario. So-mos del criterio que fue ofrecida y admitida prueba suficiente para justificar e impartir la instrucción. Le correspondía, entonces, al Jurado evaluar esa prueba y llegar a las conclusiones de hechos correspondientes. Por tal motivo respetuosamente DISIENTO del curso de acción tomado por la Mayoría.
Mediante el recurso presentado ante nos se solicita la revisión de una resolución emitida por el Tribunal de Apelaciones, Región Judicial de San Juan, mediante la cual se revocó la Sentencia emitida por el Tribunal de Primera Instancia, Sala Superior de San Juan, en la que se declaró culpable al Sr. Juan M. Negrón Ayala (señor Negrón Ayala) por los delitos de asesinato en primer grado e infracción a la Ley de Armas de Puerto Rico (Ley de Armas). El Tribunal de Apelaciones revocó las convicciones y devolvió el caso para la celebración de un nuevo juicio por razón de que el Tribunal de Primera Instancia había errado al no transmitir al Jurado las instrucciones solicitadas sobre el delito de homicidio. Veamos el cuadro fáctico que origina este recurso.
I
El 15 de noviembre de 2001, el señor Negrón Ayala entró a la oficina del Sr. Noel Colón González (señor Colón González), entonces presidente de la Unión de Tronquistas (la Unión), y lo mató de varios disparos con un arma de fuego. Sobre este hecho no existe controversia, ya que el señor Negrón Ayala lo admite.
*425 El 26 de diciembre de 2001, el Ministerio Público presentó una acusación contra éste por el delito de asesinato en primer grado y por infracción al Art. 4.04 de la Ley de Armas, 25 L.P.R.A. sec. 457i, por conducir y portar una pistola cargada sin haber obtenido una licencia y con la cual causó la muerte al señor Colón González.(1)
Luego de varios trámites procesales, el 30 de abril de 2002 comenzó el juicio por Jurado. Al finalizar la presentación de la prueba, y antes de que se presentaran los informes al Jurado, la defensa del señor Negrón Ayala solicitó verbalmente que se impartieran las instrucciones sobre el delito de homicidio.(2) El Tribunal de Primera Instancia denegó la solicitud, ya que no veía justificación para dicha instrucción y procedió a impartir instrucciones de asesinato en primer grado, segundo grado y legítima defensa.(3) El Jurado emitió veredictos de culpabilidad por mayoría de diez a dos en el delito de asesinato en primer grado y por unanimidad en el delito de violación a la Ley de Armas.
Insatisfecho, el señor Negrón Ayala acudió al Tribunal de Apelaciones, alegando la comisión de varios errores, entre ellos, la decisión del Juez del Tribunal de Primera Instancia de negarse a impartir instrucciones sobre el delito de homicidio.(4) El 31 de mayo de 2005, el Tribunal de Apelaciones determinó que, ante la prueba presentada por las partes, y admitida durante el juicio, el Tribunal de Primera Instancia estaba obligado a impartirle al Jurado instrucciones sobre el delito de homicidio.(5) En consecuencia, el foro intermedio apelativo revocó las convicciones y devolvió el caso al foro primario para la celebración de un juicio nuevo.(6)
*426 Insatisfecho, el Procurador General acude ante nos mediante recurso de certiorari, alegando la comisión del error siguiente:
Erró el Tribunal de Apelaciones al concluir que, a la luz de la prueba presentada por el Ministerio Publico y admitida en evidencia, era necesario que el juez que presidió los procedimientos impartiera instrucciones sobre el delito de homicidio voluntario, cuya ausencia diera lugar a la revocación del veredicto de culpabilidad y la sentencia dictada contra el Sr. Negrón Ayala por el delito de asesinato en primer grado. Petición de certiorari, pág. 11.
II
Durante el juicio en su fondo, el Ministerio Público y la defensa presentaron pruebas y los testimonios de dieciocho testigos. A continuación presentamos, en síntesis, lo declarado por algunos de ellos, conforme a la exposición narrativa estipulada de la prueba, a los fines de exponer los hechos que originan el caso de epígrafe.(7)
La Sr. Yolanda Landrau Ramos, recepcionista de la Unión y del Hoffa Medical Center, declaró que el 15 de noviembre de 2001, a eso de 11 Á.M., vio a los señores Colon González y Negrón Ayala caminar juntos hacia el área de las oficinas que quedaban en la parte de atrás. Atestó que mientras contestaba el teléfono escuchó una detonación, continuó hablando, escuchó entonces una segunda detonación y que al intentar salir de su área de trabajo escuchó una tercera detonación. (8)
La Sra. Nilsa Salgado Díaz, Secretaria Ejecutiva de la Unión, declaró que presenció cuando los señores Colón González y Negrón Ayala entraron juntos a las oficinas del edificio de la Unión. A los dos minutos, mientras ella se dirigía a su oficina, escuchó dos detonaciones y antes de empezar a gritar por temor y avisarle a la señora Landrau Ramos que saliera de las oficinas. Mientras estaba 11a- *427 mando al sistema de emergencias 911, miró y vio al señor Negrón Ayala pedir se llamara a la Policía, a una ambulancia y a un abogado.(9)
El Sr. Ángel Figueroa Cortés, representante de la Unión de Tronquistas, vio a los señores Colón González y Negrón Ayala caminar por el frente de él y entrar a la oficina del señor Colón González. Observó que el señor Negrón Ayala llevaba una mochila en sus manos. Escuchó una discusión que provenía de adentro de la oficina y como a los cinco o siete segundos escuchó tres detonaciones. Las detonaciones provenían de la oficina del señor Colón González, en intervalos de tres a cuatro segundos cada una. Inmediatamente se dirigió a la oficina del señor Colón González y trató de abrir la puerta sin éxito. En ese momento, el señor Negrón Ayala le indicó que se llevara a su hijo que estaba en un vehículo en el estacionamiento de la Unión. Después, sintió unos golpes de patadas en el piso y escuchó al señor Negrón Ayala decir: “¡Cabrón, quién es el próximo!”. De nuevo escuchó al señor Negrón Ayala decirle que: “Llévate a mi nene que está en el parking”. Al llegar al vehículo del señor Negrón Ayala, notó que el vehículo estaba encendido y que el hijo de éste se encontraba dentro. En ese momento observó al señor Negrón Ayala salir de las oficinas de la Unión y entregarle un arma de fuego al Sr. Juan Viñas. Después observó al señor Negrón Ayala acercarse al vehículo encendido, hablar con su hijo, echar la mochila en el carro y entrar de nuevo a las oficinas de la Unión.(10)
El Sr. José Santos Betancourt declaró que el arma de fuego —pistola Smith & Wesson 9mm, color marrón y negra, número de serie A-303533— se le extravió en octubre de 1980. Posteriormente se probó que esta fue el arma que le causó la muerte al señor Colón González.(11)
El Sr. Juan Viñas, empleado en el Departamento de Mantenimiento y Mensajería de la Unión, testificó que es *428 tando en el salón de conferencias de la Unión, escuchó las voces altas de los señores Negrón Ayala y Colón González. Se percató que la voz más alta era la del señor Negrón Ayala. Más tarde escuchó un tiro, abrió la cortina pero no vio nada. Segundos más tarde escuchó una ráfaga de tiros provenientes de la oficina del señor Colón González. Se tiró al piso, vio a la Sra. Nilsa Salgado salir corriendo, se levantó y salió corriendo detrás de ella hacia la calle. Un tiempo después, volvió a las oficinas de la Unión y se encontró al señor Negrón Ayala quien le dijo “Cógela y desaparécela”, en alusión al arma de fuego. El señor Viñas cogió el arma que estaba todavía caliente y la escondió detrás de unos sacos de cemento en el salón de conferencias de la Unión. Tres días después procedió a entregar el arma al agente José A. Mojica Rivera.(12)
El agente Agustín Rodríguez Pellot declaró que a eso de las 11:45 a.m. se le informó de un tiroteo en las oficinas de la Unión. Al llegar a las instalaciones encontró al señor Negrón Ayala intranquilo y caminando de lado a lado. Le notó manchas de sangre en los talones del pantalón, sin embargo no estaba herido en la pierna. El señor Negrón Ayala le indicó que no iba a hablar hasta que llegara su abogado.(13)
El agente Manuel Pietri, declaró que a las 11:50 a.m. recibió información de que hubo un tiroteo en la oficina de la Unión. Al llegar a la escena notó una mancha de sangre en el tobillo al señor Negrón Ayala. El señor Negrón Ayala indicó que no estaba herido. Procedió a leerle sus derechos y se puso bajo arresto. Además, encontró una carta de cesantía en el bolsillo del señor Negrón Ayala.(14)
El Dr. Luis Ariel Ortiz, médico generalista del Hoffa Medical Center, declaró que estaba en la Oficina Administrativa de la Unión cuando escuchó al Sr. Luis Viñas decir: *429 “Llamen a la ambulancia que Juan mató a Noel”. En ese momento se dirigió a la oficina del señor Colón González, donde encontró su cuerpo herido y observó varias manchas de sangre en la pared. Describió que el señor Colón González estaba acostado y parecía que había chocado contra la pared y se había deslizado.(15)
El Dr. Francisco Cortés González, patólogo forense, adscrito al Instituto de Ciencias Forenses, declaró que la autopsia del señor Colón González se llevó a cabo el 16 de noviembre de 2001 y se preparó el informe médico forense el 11 de enero de 2002. Identificó seis heridas de bala en el cuerpo, con trayectorias de abajo hacia arriba y otras con trayectoria de arriba hacia abajo.(16)
El señor Negrón Ayala declaró que el 15 de noviembre de 2001, tuvo una reunión a las 6:00 a.m. en Mayagüez. Su hijo lo acompañó ese día, ya que su esposa estaba en unos seminarios en Estados Unidos. Más tarde en la mañana recibió una llamada del señor Colón González en la cual lo citó a una reunión en las oficinas de la Unión. Al llegar a la Unión, ambos entraron a la oficina del señor Colón González y el señor Negrón Ayala se sentó en una silla. El señor Colón González abrió una gaveta del escritorio y le entregó al señor Negrón Ayala la carta de despido. Éste la leyó y le cuestionó por qué estaban tomando esa acción. A esto, el señor Colón González le indicó, “¿Esto es lo que hay?”; y el señor Negrón Ayala le dijo “Bueno, ustedes me van a tener que pagar la mesada que le pagaron a Gabby”. El señor Colón González ripostó alegadamente, “lo que te vamos a pegar a ti es un tiro, cabrón”. En ese momento observó al señor Colón González tratar de sacar una pistola del escritorio y fue, entonces, cuando se le abalanzó encima, forcejearon, momento cuando afirmó que la mente se le fue en blanco y que lo próximo que recuerda fue ver al señor Colón González a sus pies. No estaba consciente de cuántos *430 tiros había disparado, no tenía noción de los casquillos en el piso ni de lo que había pasado.(17)
III
La Constitución de Puerto Rico dispone que toda persona que sea acusada por la comisión de un delito grave tiene derecho a un juicio por un Jurado.(18) La Regla 111 de Procedimiento Criminal reconoce el derecho a ser juzgado por sus pares a todo acusado de delito grave.(19)
En nuestra jurisdicción le corresponde al Jurado el deber de actuar como juzgador de los hechos presentados durante el juicio.(20) Ello implica que será ese Jurado quien tiene la última palabra no sólo en cuanto a la culpabilidad o inocencia del imputado, sino en cuanto a la responsabilidad de evaluar los hechos que se le imputan con relación al delito en específico, o el grado de éste, por el cual éste debe responderle a la sociedad.(21) Su función principal es evaluar la evidencia presentada durante el juicio y llegar a las conclusiones de los hechos correspondientes.(22)
Al finalizar el Ministerio Público y la defensa su presentación de la evidencia, el juez que preside el proceso instruirá al Jurado sobre el derecho aplicable al caso.(23) Las instrucciones al Jurado deben cubrir, si la prueba lo justifica, no sólo los elementos del delito imputado sino los delitos inferiores al delito imputado o comprendido en éste. También se deben incluir los elementos esenciales de las defensas argumentadas por el acusado, así como los puntos *431 del derecho que según cualquier teoría pueden estar presentes en las deliberaciones, aunque la prueba de defensa sea débil, inconsistente o de dudosa credibilidad. De igual forma se deben incluir instrucciones sobre la forma de culpabilidad exigida para el delito imputado, es decir, sobre la intención o negligencia criminal requerida.(24) Ello, en vista de que el mens rea es un elemento subjetivo que le corresponde determinar al Jurado a la luz de los hechos.(25)
Las instrucciones sobre los delitos inferiores no serán transmitidas de forma automática al Jurado. Será necesario que exista evidencia de la cual el Jurado pueda razonablemente inferir que el acusado es culpable del delito inferior.(26) Sobre este particular se ha expresado lo siguiente:
[E]sto sólo puede significar que haya evidencia admitida, que de ser creída por el jurado, sería suficiente como cuestión de derecho penal sustantivo, para que el acusado prevalezca. El juez no debe aquí hacer juicio de credibilidad alguno para no impartir la instrucción, pues estaría usurpando funciones del [Jlurado, en violación al derecho constitucional del acusado a juicio por [J]urado.(27)
En Pueblo v. Galarza, 71 D.P.R. 557, 561-562 (1950), citando a Stevenson v. United States, 162 U.S. 313, 314— 315 (1896), nos expresamos sobre la procedencia de una instrucción por el delito de homicidio en un procedimiento seguido contra un acusado:
“No es necesario que la prueba de homicidio resulte incontrovertida o concluyente sobre la cuestión; mientras haya algún indicio de prueba a ese efecto, el [Jlurado es el llamado a aquilatar la misma. De haber alguna evidencia tendiente a demostrar un estado de hechos que haga caer el caso dentro de la definición de homicidio ... es al [Jlurado que incumbe determi *432 nar si tal prueba es cierta o no, y si la misma demuestra que el delito cometido fu[e] homicidio ... y no asesinato.
Para la corte la prueba puede tender a demostrar de manera abrumadora que se trata en verdad de un asesinato, y no de un homicidio o de un acto de defensa propia. Empero, mientras haya alguna prueba pertinente a la cuestión de homicidio, la credibilidad y peso de la misma es cuestión a ser determinada por el [J]urado, y no una de derecho a ser resuelta por el tribunal.”(28) (Traducción y énfasis suplidos.)
En Pueblo v. Galarza, supra, pág. 562, citando a Kinard v. United States, 96 F.2d 522, 525 (1938), expresamos lo siguiente:
“Es cierto que la declaración del acusado fue abiertamente controvertida. Podría sostenerse que la prueba tendía a demostrar de manera abrumadora que se había cometido un asesinato más bien que un homicidio voluntario. ... No era el deber de la corte sentenciadora apreciar la prueba y determinar si el acusado era culpable de asesinato o homicidio, sino meramente determinar la cuestión preliminar de derecho, o sea si hubo tal carencia de prueba sobre homicidio que exigía que la cuestión no fuera sometida a la consideración del [J]urado ....
El hecho de que en el presente caso hubiera otra prueba altamente persuasiva de que se trataba de un asesinato, no afecta la aplicación de la regla enunciada.” (Traducción nuestra.)(29)
Por frágil que sea, si de la prueba surge alguna evidencia que justifique un veredicto de homicidio, se deben comunicar las instrucciones de tal delito.(30) “No importa lo increíble que pueda parecer determinada evidencia al juez que dirige la celebración de un juicio por Jurado. No es a él sino al \J\urado al que corresponde decidir sobre el crédito que deba darse a los testigos”. (Enfasis suplido.)(31) Sin em *433 bargo, no se deben transmitir tales instrucciones si los autos carecen totalmente de evidencia que justifique tal veredicto.(32) Permitir que se informen tales instrucciones de homicidio, cuando los autos están huérfanos de evidencia que justifique tal veredicto, equivale a autorizar al Jurado que imponga un castigo diferente al prescrito para el delito que se cometió.(33)
El Art. 85 del antiguo Código Penal de Puerto Rico dis-pone que incurre en el delito de homicidio “[t]oda persona que matare a otra en ocasión de súbita pendencia o arrebato de cólera”.(34) (Énfasis suplido.) Los elementos de este delito radican en dar muerte a un ser humano, como consecuencia de una pendencia súbita o de un arrebato de cólera, causado por una provocación por parte de la víctima.(35) Se trata de un acto intencional e ilegal que causa la muerte, pero por existir circunstancias atenuantes la calificación del delito y la pena varían en beneficio del acusado.(36) La circunstancia atenuante se da cuando el acto del acusado consiste de una reacción irreflexiva, pasional, súbita e inmediata, provocada por la víctima u otra persona actuando con ésta.(37) Según esta modalidad, la muerte de la víctima se produce sin mediar premeditación y sin un plan previo para matar.(38) La provocación que mueve al autor del delito tiene que ser de tal naturaleza que lleve a una persona ordinaria perder su dominio por unos impulsos mentales causados por cólera, pendencia o una emoción violentad.(39) Asimismo hemos sostenido que “[si] no existe esa provocación o si habiendo existido *434 no es lo suficientemente grave y la actuación del matador está fuera de toda proporción con el grado de la provocación, el acto de dar muerte constituye asesinato aunque el acusado no hubiese preconcebido la idea”.(40) El elemento de maldad o malicia está ausente en este delito.(41) De igual forma, la sed de venganza nunca será razón suficiente para catalogar el delito de asesinato como un homicidio. (42)
En la modalidad del homicidio por arrebato de cólera se requiere que exista una provocación previa que sea lo suficientemente capaz de lograr una reacción violenta, intencional, pero no calculada, ni preconcebida, en el hombre prudente y razonable.(43) En cambio, en la modalidad del homicidio por súbita pendencia, se requiere la existencia de una pelea súbita, a la cual se entra sin la intención previa de matar o de causar algún tipo de daño corporal.(44) Estas características son las que, precisamente, diferencian al homicidio del asesinato en primer y segundo grado. De transcurrir un lapso de tiempo durante el cual la persona pueda recobrar su autocontrol, o ha recapacitado o premeditado, entonces se tratará de un asesinato y no de un homicidio.(45)
Sobre los factores necesarios para determinar la posible comisión del delito de homicidio hemos expresado lo siguiente:
Estos son: (i) que la muerte haya ocurrido mientras el actor se encontraba en un arrebato de cólera o pendencia súbita (heat of passion); (ii) que la muerte estuviera precedida de una provocación adecuada, y (iii) que la muerte haya ocurrido antes de que el arrebato o pendencia sufrida por el actor razonablemente se hubiera enfriado (cooling off period).(46)
*435 IV
La opinión mayoritaria sostiene que el foro intermedio apelativo erró al ordenar un nuevo juicio, ya que la única instrucción que estaba justificada por la prueba fue el delito de asesinato y sus distintos grados. Diferimos. Veamos.
El señor Negrón Ayala declaró que el día de los hechos el señor Colón González le entregó una carta de despido, a lo cual él le indicó que iban a tenerle que pagar una cantidad de dinero en concepto de mesada. A esto, el señor Colón González le contestó “[l]o que te vamos a pegar a ti es un tiro cabrón”. En ese momento observó al señor Colón González tratar de sacar un arma de fuego de una gaveta del escritorio y fue entonces cuando se le abalanzó encima, forcejearon, momento cuando sostuvo que se le fue la mente en blanco y lo próximo que recuerda fue ver al señor Colón González en sus pies.
Es menester señalar que el testimonio del señor Negrón Ayala es el único que narra lo que alegadamente ocurrió en la oficina del señor Colón González. El resto de los testimonios se limitan a describir lo que se escuchó antes de las detonaciones y lo que se pudo observar después de ellas. Sin embargo, dos testigos de cargo declararon que oyeron una discusión entre los señores Negrón Ayala y Colón González antes de las detonaciones. El testigo, Sr. Ángel Figueroa Cortés, escuchó una discusión que provenía de la oficina del señor Colón González y unos segundos después escuchó las detonaciones. El Sr. Juan Viñas narró que escuchó las voces altas de los señores Negrón Ayala y Colón González, momentos antes de la primera detonación.
Con el beneficio de la evidencia descrita, nos corresponde evaluar si el Tribunal de Primera Instancia tenía la obligación de impartirle al Jurado las instrucciones solicitadas por la defensa sobre el delito de homicidio. Como piedra angular de su teoría, la defensa intentó demostrar que la amenaza con un arma de fuego por parte del señor Colón González hacia el señor Negrón Ayala fue la causa de la reacción defensiva que provoca una reyerta entre *436 ambos. Es durante ésta que el señor Negrón Ayala alegadamente sufre tal arrebato de cólera o súbita pendencia que causa que su mente se vaya en blanco y le dé muerte al señor Colón González, sin la malicia premeditada requerida para que constituya un asesinato.
Creemos que la evidencia presentada en el caso de autos era suficiente para que el Tribunal de Primera Instancia impartiera las instrucciones al Jurado sobre el delito de homicidio. Le correspondía entonces al Jurado aquilatar la versión del acusado y evaluar si el testimonio establecía que la muerte del señor Colón González era consecuencia de un homicidio. A nuestro entender, se presentó evidencia sobre la cual el Jurado estaba en posición de determinar si el señor Negrón Ayala se encontraba en un estado de súbita pendencia o arrebato de cólera al momento de causarle la muerte al señor Colón González. Hay pruebas de una discusión a puertas cerradas, una carta de despido, unas voces altas, de una alegada provocación al sacarse un arma de fuego, una posible legítima defensa, unos tiros, una alegada reacción violenta defensiva y un estado de intranquilidad por parte del acusado posterior al incidente. Están presentes elementos suficientes para permitir la instrucción de homicidio solicitada por la defensa. Se debió someter la cuestión al Jurado, para que fuera éste quien rindiera el veredicto que procedía.
La opinión mayoritaria enumera una lista de hechos que el juzgador debía “razonablemente inferir”. Comienza indicándonos que el juzgador debió “razonablemente inferir” que el señor Negrón Ayala llevaba el arma de fuego en la mochila, lo cual demuestra premeditación. Es menester recalcar que la prueba directa desfilada durante el juicio nunca estableció que en la mochila del señor Negrón Ayala había un arma de fuego. Sin embargo, de la misma forma que se podía “inferir razonablemente” que el arma de fuego se encontraba en la mochila del señor Negrón Ayala, podía también “razonablemente inferirse” que en la gaveta del escritorio del señor Colón González era donde se encontraba esa arma de fuego. Ciertamente, a la luz de la evi *437 dencia y del testimonio del señor Negrón Ayala, ambos asuntos podían ser “razonablemente inferidos” por el juzgador de los hechos. Por ende, era al Jurado, y no al juez, a quien le correspondía decidir cuál de ambas versiones podía determinar como cuestión de hecho, de forma indirecta.
La opinión mayoritaria expresa, además, que se debe inferir que no hubo discusión mayor, o conflicto, ya que el “primer disparo se escuchó casi inmediatamente después” que entraran a la oficina, y esto “elimina la posibilidad de una provocación o arrebato de cólera que justificara la instrucción de homicidio voluntario al Jurado...”. (Enfasis suprimido.) Opinión mayoritaria, pág. 422. Es menester particulizar que el único testimonio que le narra al Jurado lo que alegadamente ocurrió dentro de la oficina del señor Colon González es el del acusado, señor Negrón Ayala. El señor Negrón Ayala testificó que después que reclamó el pago de mesada, fue que el señor Colón González le dijo “lo que te vamos a pegar a ti es un tiro, cabrón” y observó al señor Colón González tratar de sacar una pistola del escritorio. Fue entonces cuando se le abalanzó encima, forcejearon, y se le fue la mente en blanco. Se podía inferir que la conversación fue de corta duración, porque el señor Colón González amenazó al acusado con un arma de fuego en un espacio limitado de tiempo, lo que provocó el forcejeo entre ambos y el desenlace que ya conocemos. Ala luz de la evidencia y del único testimonio de los hechos que tenemos, ambos asuntos podían ser “razonablemente inferidos” por el juzgador de hechos. Por ende, era al Jurado y no al juez, al que le correspondía decidir a cuál de ambas versiones debía brindarle crédito.
No hay duda que el despido del señor Negrón Ayala por parte del señor Colón González fue lo que motivó la reunión entre ambos. Tanto es así, que al señor Negrón Ayala se le encontró una carta de despido en el bolsillo del pantalón. Según el testimonio del señor Negrón Ayala, se podía “razonablemente inferir” que lo que provocó la discusión inicial entre ambos fue el despido. Se podía inferir, como sostiene la opinión mayoritaria, pág. 422, “que el mo *438 tivo de la agresión fue por haber sido despedido de su trabajo”. Pero también se podía “inferir razonablemente” que lo que provocó la situación y el enfrentamiento entre ambos fue la amenaza del señor Colón González y su movimiento para extraer un arma de fuego de su escritorio. Era al Jurado, y no al juez, a quien le correspondía formular razonablemente la inferencia que le permitiera determinar los hechos.
El juzgador de los hechos podía “razonablemente inferir”, que “el acusado Negrón Ayala ciertamente tenía la intención específica de matar a Colón González, pues le disparó seis veces...”. Opinión mayoritaria, pág. 422. No se encuentra en controversia que el señor Colón González recibió seis disparos. Se puede “inferir razonablemente” que disparar repetidas veces a una persona es evidencia de una intención específica de matar. Sin embargo, en el caso de marras no hay evidencia directa de que esa fue la situación. El único testigo de los hechos es el propio acusado. Su testimonio narra que cuando el señor Colón González sacó la pistola del escritorio, él se le abalanzó encima, forcejearon, se le fue la mente en blanco y que lo próximo que recuerda es ver al señor Colón González a sus pies. Según este testimonio, se puede “razonablemente inferir” que una persona amenazada con un arma de fuego sufra una reacción de tal magnitud que le cause que su mente se vaya en blanco. Y en ese alterado estado anímico, en medio de un forcejeo entre dos hombres, donde hay un arma de fuego implicada —in the heat of passion— se pierda la noción de cuántos disparos se hagan. Era al Jurado y no al juez, a quien le correspondía decidir a cuál de ambas versiones brindarle crédito.
Sostiene la Mayoría que el juzgador de los hechos podía “razonablemente inferir”, que el “acusado actuó fríamente al cometer el delito, pues luego de los disparos, salió y dio instrucciones sobre el cuido de su hijo y solicitó que desaparecieran el arma de fuego, lo cual demuestra que estuvo en control de sus emociones todo el tiempo”. Opinión mayoritaria, pág. 422. Sin embargo, a base de la prueba directa des *439 filada, el juzgador de los hechos también podía “razonablemente inferir” que si el señor Negrón Ayala, fríamente y con sed de venganza, premeditó la muerte del señor Colón González, no hubiera ido acompañado con su hijo menor de edad a cometer tal barbaridad.
De otra forma, un Jurado podía “razonablemente inferir” que el hecho de que el acusado solicitara que se desapareciera el arma y se cuidara a su hijo, eran actos instintivos de autoprotección, a poco tiempo de un incidente altamente violento, confuso y traumático. De nuevo, era al Jurado, y no al juez, a quien correspondía decidir a cuál de ambas versiones brindarle crédito.
Todo ello nos lleva a la conclusión de que ante el panorama de posibles “inferencias razonables”, era el Jurado como juzgador de hechos, y no el juez, quien tenía que determinar si brindaba credibilidad al testimonio del señor Negrón Ayala.
Muy distinto sería el asunto si, por ejemplo, hubiera existido la evidencia incontrovertible de que el arma de fuego sí estaba en la mochila del señor Negrón Ayala. Dada esa situación, ya no era razonable inferir que el señor Negrón Ayala actuó como él dice que actuó. Pero esa evidencia no existe en este caso, lo único que tenemos es el testimonio del señor Negrón Ayala sobre lo que alegadamente ocurrió dentro de esa oficina. Era el Jurado quien tenía que decidir si brindaba credibilidad al testimonio del señor Negrón Ayala. Eso no le correspondía al Juez.
La opinión mayoritaria también expresa que el testimonio del señor Negrón Ayala no establece una provocación “de tal naturaleza que lleve a una persona ordinaria a perder su dominio y actuar bajo impulsos mentales causados por cólera, pendencia o emoción violenta”.(47) Pueblo v. Rosario, 160 D.P.R. 592, 608 (2003). Diferimos de tal criterio; el testimonio del señor Negrón Ayala establece que el señor Colón González le dijo “lo que te vamos a pegar a ti es un tiro, cabrón”, y que el señor Colón González trató de sacar *440 una pistola de su escritorio. Entendemos que amenazar y a la vez sacar un arma de fuego es una provocación “de tal naturaleza que lleva a una persona ordinaria a perder su dominio y actuar bajo impulsos mentales causados por cólera, pendencia o emoción violenta”.(48) Sacar un arma de fuego a otro ser humano, ciertamente, puede causar una “reacción irreflexiva, pasional, súbita e inmediata, provocada por la víctima u otra persona actuando con ésta”. (Enfasis suprimido.)(49)
Hemos dicho que procede revocar una convicción cuando el resultado del juicio posiblemente hubiera sido distinto de haberse comunicado cierta instrucción al Jurado.(50) Un juez no puede denegar una instrucción solicitada por la defensa sólo porque le parezca débil o de pobre calidad la evidencia presentada, si de esa prueba surge alguna evidencia que justifique cierta instrucción. Es deber del juez comunicar esa instrucción y permitir que sea el Jurado el árbitro final al esclarecer los hechos. Es al Jurado a quien le correspondía determinar si la versión de los testigos que escucharon una discusión y la versión del acusado merecían credibilidad suficiente como para configurar el delito de homicidio.
En su escrito, el Ministerio Público argumenta —y la Mayoría sostiene— que la instrucción solicitada por el delito de homicidio es incompatible con la teoría de legítima defensa que sostiene el señor Negrón Ayala. Sin embargo, este Tribunal ha expresado lo siguiente:
“Cuando tanto homicidio como defensa propia están en controversia y sostenidos por la prueba, deben darse instrucciones sobre ambos. Aunque se alegue defensa propia o se demuestre por la prueba, una instrucción de homicidio debe ser dada ....” (Énfasis suplido.)(51)
No existe obstáculo alguno para que un juez emita ins *441 trucciones separadas de homicidio y legítima defensa siempre y cuando sean sostenidas por la prueba desfilada. Si la prueba tiende a sostener tanto una instrucción de homicidio como una de defensa propia, es obligación del juez impartir ambas instrucciones al Jurado, y que sea el juzgador de los hechos el que decida. Por ende, respetuosamente entendemos que concluir que una instrucción de homicidio es incompatible con una de defensa propia no es correcto, pues, dado los hechos de este caso, son compatibles.
En el caso de marras, el juez debió impartir al Jurado las instrucciones de asesinato, homicidio y legítima defensa. Le correspondía al Jurado evaluar la evidencia presentada y llegar a sus propias conclusiones. Opinamos que el testimonio del acusado y la evidencia presentada en el caso de autos eran suficientes para que el Tribunal impartiera las instrucciones al Jurado sobre el delito de homicidio. Al no hacerlo, el juez usurpó las funciones del Jurado y posiblemente alteró el resultado final del juicio.
Concluimos que el resultado del juicio pudo haber sido distinto de haberse brindado las instrucciones solicitadas por la defensa. Un análisis objetivo y sereno de la evidencia que desfilara ante el juzgador de los hechos, nos convence de que se presentó prueba suficiente para justificar la instrucción del delito de homicidio. Se cometió un grave error peijudicial al acusado al no hacerlo. Procedía que el Tribunal de Primera Instancia impartiera al Jurado las instrucciones de: asesinato en primero y segundo grado; homicidio; la diferencia entre el asesinato y homicidio, y legitima defensa. Le correspondía al Jurado evaluar la evidencia presentada y llegar a las conclusiones correspondientes de hechos.
V
Por los fundamentos antes expuestos, concluimos que actuó correctamente el Tribunal de Apelaciones. Confirmaríamos la sentencia recurrida y devolveríamos el caso al Tribunal de Primera Instancia para la celebración de un *442 nuevo juicio. Por no ser ese el curso de acción de la Mayoría, respetuosamente DISENTIMOS.

 Apéndice de la Petición de certiorari, págs. 106-107; Ley Núm. 404 de 11 de septiembre de 2000, según enmendada, 25 L.P.R.A. sec. 455 et seq.

 Apéndice de la Petición de certiorari, pág. 252.

 íd., págs. 252-253.

 íd., págs. 90-112.

 íd., págs. 5-58.

 íd.

 íd., págs. 207-254.

 íd., págs. 208-211.

 íd., págs. 211-212.

 íd., págs. 212-216.

 íd., pág. 216.

 íd., págs. 216-220.

 íd., págs. 220-221.

 íd., págs. 221-222.

 íd„ págs. 223-225.

 íd., págs. 236-237.

 íd., págs. 240-247.

 Art. II, Sec. 11, Const. E.L.A., L.P.R.A., Tomo 1. Véanse, además: Pueblo v. Bonilla Ortiz, 123 D.P.R. 434, 438-439 (1989); Pueblo v. Cruz Correa, 121 D.P.R. 270, 276 (1988).

 34 L.P.R.A. Ap. II. Véase, además, Pueblo v. Lorio Ormsby I, 137 D.P.R. 722, 727 (1994).

 Pueblo v. Cruz Correa, supra.

 íd.

 Pueblo v. Rosario, 160 D.P.R. 592 (2003).

 Pueblo v. Cruz Correa, supra.

 Pueblo v. Rosario, supra.

 íd.

 íd.

 E.L. Chiesa Aponte, Derecho procesal penal de Puerto Rico y Estados Uni-dos, Colombia, Ed. Forum, 1992, Vol. II, pág. 332.

 Pueblo v. Galarza, 71 D.P.R. 557, 561—562 (1950). Stevenson v. United States, 162 U.S. 313, 314-315 (1896).

 Pueblo v. Galarza, supra; Kinard v. United States, 96 F.2d 522 (D.C. Cir. 1938).

 Pueblo v. Moreno Morales I, 132 D.P.R. 261, 283. (1992); Pueblo v. López Guzmán, 131 D.P.R. 867, 887 (1992).

 Pueblo v. Fernández, 49 D.P.R. 586, 592 (1936).

 Pueblo v. Rosario, supra; Pueblo v. Cruz Correa, supra, pág. 278; Pueblo v. Torres Rodríguez, 119 D.P.R. 730, 744 (1987); Pueblo v. González Colón, 110 D.P.R. 812, 820 (1981); Pueblo v. Galarza, supra.

 Pueblo v. Moreno Morales I, supra.

 33 L.P.R.A. sec. 4004.

 D. Nevares-Muñiz, Codigo Penal de Puerto Rico: revisado y comentado, 6ta ed. rev., San Juan, Inst. Desarrollo Derecho, 2000, págs. 152-154.

 Pueblo v. Rosario, supra. Véase, además, Nevares-Muñiz, op. cit., pág. 153.

 íd.

 Pueblo v. Moreno Morales I, supra.

 Pueblo v. Rosario, supra.

 Pueblo v. Lebrón, 61 D.P.R. 657, 667 (1943).

 Pueblo v. Rosario, supra.

 íd.

 Nevares-Muñiz, op. cit., pág. 154.

 Pueblo v. Rosario, supra.

 íd.

 Pueblo v. Rosario, supra, págs. 608-609.

 Véanse: Pueblo v. Negrón Caldero, 157 D.P.R. 413 (2002); Pueblo v. Moreno Morales I, supra, pág. 283.

 Pueblo v. Rosario, 160 D.P.R. 592, 607 (2003).

 Pueblo v. Rosario, supra, pág. 607.

 Pueblo v. Acevedo Estrada, 150 D.P.R. 84, 96 (2000).

 Pueblo v. Fernández, supra.