Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| EL PUEBLO DE PUERTO RICO<br><br>Apelado<br><br>V.<br><br>ALEXANDER GRAVE RAMOS<br><br>Apelante | KLAN202300099 | Apelación procedente del Tribunal de Primera Instancia Sala de Superior de Ponce<br><br>Caso Núm.:<br>J VI2019G0010;<br>J LA2019G0106,<br>J LA2019G0107<br><br>Sobre:<br>Art. 93 (A) CP,<br>Art. 5.04 LA,<br>Art. 5.15 LA |
|---|---|---|

Panel integrado por su presidente, el Juez Rodríguez Casillas, la Jueza Mateu Meléndez y el Juez Marrero Guerrero.

Marrero Guerrero, Juez ponente.

### SENTENCIA

En San Juan, Puerto Rico, a 12 de septiembre de 2024.

Comparece el señor Alexander Grave Ramos (apelante o señor Grave Ramos) y solicita que revoquemos varias *Sentencias* dictadas el 13 de enero de 2023 por el Tribunal de Primera Instancia, Sala Superior de Ponce (TPI o Foro Primario). En estas, tras un veredicto unánime de culpabilidad y ser declarado culpable y convicto por los delitos de asesinato en primer grado;[1] portación y uso de armas de fuego sin licencia,[2] y disparar o apuntar armas,[3] el TPI le impuso al apelante una pena total de ciento veintinueve (129) años de reclusión.

Con el beneficio de la comparecencia de ambas partes y por contar con la transcripción de la prueba oral (TPO), nos encontramos en posesión de resolver.

Se adelanta la confirmación de los dictámenes apelados.

---

[1] Art. 93 del Código Penal de Puerto Rico, Ley Núm. 146-2012, según enmendada, 33 LPRA sec. 5142.
[2] Art. 5.04 de la Ley de Armas de Puerto Rico, Ley Núm. 404-2000, según enmendada, 25 LPRA sec. 458c, derogada pero vigente al momento de ocurrir los hechos.
[3] Art. 5.15 de la Ley de Armas, *supra*, sec. 458n, derogada pero vigente al momento de ocurrir los hechos.

**I.**

Luego de varios trámites que resulta innecesario pormenorizar aquí, el TPI encontró causa probable para acusar contra el señor Grave Ramos por un (1) cargo por violación al Artículo 93 del Código Penal, *supra*, sec. 5142 (asesinato en primer grado); un (1) cargo por infracción al Artículo 5.04 de la Ley de Armas, *supra*, sec. 458c (portación y uso de armas de fuego sin licencia) y un (1) cargo por contravención al Artículo 5.15 de la Ley de Armas, *supra*, sec. 458n (disparar o apuntar armas). En consecuencia, el 17 de octubre de 2019, el Ministerio Público presentó las correspondientes acusaciones. En esencia, al apelante se le imputó que, para allá para el 7 de agosto de 2019, a las cuatro y cuarenta de la tarde (4:40 p.m.) en Ponce, Puerto Rico, ilegal, voluntaria, maliciosa y criminalmente, a propósito, y con conocimiento, realizó varias detonaciones con un arma de fuego en diferentes partes del cuerpo del señor Carlos Alberto Babilonia Ildefonso (señor Babilonia Ildefonso), siendo esto la causa directa de su muerte. Se alegó que el señor Grave Ramos apuntó y disparó un arma de fuego en un lugar público, donde había personas que podían sufrir daño, sin ser en ocasión del desempeño de funciones oficiales o actividades legítimas de deportes. Por último, se imputó que el apelante, voluntaria, maliciosa y criminalmente, portaba un arma de fuego sin tener una licencia expedida por un tribunal ni por la Policía de Puerto Rico y sin autorización en ley para ello, la cual se utilizó para cometer el delito de asesinato contra el señor Babilonia Ildefonso.

En el juicio en su fondo ante un jurado, el Ministerio Público ofreció como prueba de cargo el testimonio del señor Jean Medina García, el señor Luis García Rosado, el señor Luis Ramírez Ramírez, la señora Ivette Torres Vega, la señora Lizmarie Mejías Rodríguez, el señor Pedro Soto Rodríguez, el agente Jason Rodríguez Collado, el agente Fernando Tarafa Pérez, el agente José A. Feliciano Vega, el

agente Francisco Semidei Delgado, el agente Marcos Femenías Torres, el señor Félix Ortiz Martínez, el agente José M. Pérez Montes, el agente Doel Santos Santiago, la doctora Rosa Marian Rodríguez Castillo y la señora Angélica María Resto Rivera. Por su parte, el apelante presentó su propio testimonio. En adelante, se sintetiza lo declarado por los testigos:

**<u>Jean Medina García</u>**

El señor Medina García testificó que entre las tres (3:00 p.m.) o cuatro de la tarde (4:00 p.m.) del 7 de agosto del 2019, se encontraba en el taller del señor Babilonia Ildefonso para verificar su vehículo.[4] Relató que mientras estaba sentado en el asiento del pasajero de su vehículo y el señor Babilonia Ildefonso ocupaba el asiento del conductor, llegó un caballero que en la sala del TPI señaló como el señor Grave Ramos, quien estaba alterado, molesto y gritando.[5] Atestó que el caballero portaba un *shock absorber* y un plato que tiró al piso, al pie de la puerta de su vehículo.[6] Indicó que el caballero manifestó que quería su dinero, que no deseaba dialogar y que no quería saber más sobre el asunto.[7] Declaró que el señor Babilonia Ildefonso salió del vehículo para dialogar con el caballero, por lo que ambos se dirigieron hacia el exterior del taller.[8] El testigo expuso que se quedó en el taller dialogando con otro mecánico, pero escuchó una discusión y que el señor Babilonia Ildefonso dijo "¿pero tú no has hablado conmigo?".[9] Observó que luego de ambos hablar con movimiento en las manos, el señor Babilonia Ildefonso se dirigió hacia su oficina y el caballero lo siguió.[10] El testigo manifestó que los perdió de vista, ya que una pared dividía el taller de la oficina del

---

[4] TPO del 23 de mayo de 2022, pág. 29, líneas, 1-14.
[5] *Íd.*, pág. 30, líneas 14-40.
[6] *Íd.*, líneas 21-24; pág. 31, líneas 1-10.
[7] *Íd.*, líneas 10-13.
[8] *Íd.*, líneas 13-18.
[9] *Íd.*, líneas 32-40.
[10] *Íd.*, pág. 32, líneas 24-28.

señor Babilonia Ildefonso.[11] Puntualizó que en alrededor de treinta (30) segundos, escuchó dos (2) detonaciones y luego tres (3) adicionales.[12] El testigo precisó que se lanzó al suelo orientándose hacia el exterior para observar lo que sucedía y notó que el señor Grave Ramos salió corriendo hacia su vehículo BMW color gris, en el cual se marchó aceleradamente.[13] Expuso que caminó hacia la oficina del señor Babilonia Ildefonso, quien se encontraba tirado en el cemento de camino hacia su oficina, sin respirar y con un impacto de bala en su pecho.[14]

### Luis García Rosado

El señor García Rosado declaró que para el año 2019 laboraba como mecánico en el Taller Babilonia, junto con el señor Babilonia Ildefonso y el mecánico Piti.[15] Testificó que el 7 de agosto de 2019, entre las cuatro (4:00 p.m.) a cinco de la tarde (5:00 p.m.), se encontraba en el taller limpiando y recogiendo sus herramientas.[16] Precisó que en ese momento llegó un cliente que era joven, delgado, de estatura media, con barba y cabello colorado, que portaba un *shock absorber* y un *strut mount.*[17] Identificó que el cliente que llegó al taller era el señor Grave Ramos.[18] Señaló que previo a los hechos, dicho cliente acudió al taller como en siete (7) ocasiones para verificar su vehículo BMW.[19] Concretó que cuando el cliente comenzó a hablar, arrojó las piezas, y el señor Babilonia Ildefonso se lo llevó a su oficina, como era su práctica habitual con los clientes.[20] El testigo detalló que luego de uno (1) a dos (2) minutos se escucharon entre cinco (5) a siete (7) detonaciones.[21] Estableció que al escuchar las

---

[11] *Íd.*, líneas 30-38.
[12] *Íd.*, pág. 33, líneas 7-17.
[13] *Íd.*, líneas 25-41; pág. 34, líneas 1-24.
[14] *Íd.*, pág. 34, líneas 29-41.
[15] *Íd.*, pág. 65, líneas 10-39.
[16] *Íd.*, pág. 66, líneas 20-25.
[17] *Íd.*, pág. 68, líneas 12-27.
[18] *Íd.*, pág. 70, líneas 4-11.
[19] *Íd.*, líneas 34-39; *Íd.*, pág. 69, líneas 1-2.
[20] *Íd.*, pág. 69, líneas 15-19.
[21] *Íd.*, líneas 28-30.

detonaciones, se escondió detrás de un vehículo y escuchó un auto saliendo bruscamente.[22] Al salir a la acera, se encontró con el cuerpo del señor Babilonia Ildefonso ensangrentado.[23]

### Luis Ramírez Ramírez

El señor Ramírez Ramírez testificó que para el año 2019 trabajaba como técnico automotriz para el señor Babilonia Ildefonso junto con el señor García Rosado.[24] Afirmó que conocía al señor Grave Ramos, dado que llevó al taller un vehículo BMW Twin Turbo que estaba humeando por las turbinas, según diagnosticado por el apelante.[25] Concretó que le indicó al señor Grave Ramos que sólo podía desmontar las turbinas sin garantía por comprar piezas no originales y que en otro lugar debían repararlas.[26] Declaró que cuando el señor Grave Ramos recogió las turbinas, se las llevó de dos (2) a tres (3) semanas para repararlas y luego volvió al Taller Babilonia.[27] Indicó que, una vez llamó al señor Grave Ramos para buscar el vehículo, volvió en varias semanas por un trabajo de fuga de líquidos que no estaba garantizado, pero que se le arregló gratuitamente.[28] Relató que en la próxima semana, el señor Grave Ramos retornó al Taller Babilonia para reclamar el arreglo del PC Bar de su vehículo.[29] Posteriormente, regresó al Taller Babilonia indicando que continuaba la fuga de líquidos en su vehículo, a lo que el señor Ramírez Ramírez le indicó que no tenía garantía, dado que ya había arreglado dicha problemática aparte, por lo que el apelante respondió molesto y se marchó.[30] Estableció que a las tres y media de la tarde (3:30 p.m.) del 5 de agosto de 2019, el apelante le envió al señor Ramírez Ramírez el siguiente mensaje:

---

[22] *Íd.*, líneas 34-41; pág. 70, líneas 21-31.
[23] *Íd.*
[24] *Íd.*, pág. 79, líneas 32-39.
[25] *Íd.*, pág. 81 líneas 12-40; pág. 82, línea 1.
[26] *Íd.*, pág. 82, líneas 1-2.
[27] *Íd.*, líneas 16-34.
[28] *Íd.*, pág. 83, líneas 14-22.
[29] *Íd.*, líneas 26-40; pág. 84, líneas 1-12.
[30] *Íd.*, pág. 84, líneas 9-12.

> Te quedó cabrón, todas las piezas que dañaste. Mañana voy para allá y no es para nada bueno. Te las voy a tirar allí y quiero mis chavos en la mano, los de la mano de obra y estoy bregando porque no voy a cobrarte todas las piezas que compré. No voy a hablar más, los recibos están allí, yo lo que quiero lo de la mano de obra, más ná, se acabó la charla. Si tienes envidia, me tiras cuando estén de frente. No te hagas el Por, eso picheas para el trabajo de la suspensión y de, PCB. (omisiones en el original)[31]

El señor Ramírez Ramírez declaró que le mostró el mensaje al señor Babilonia Ildefonso, quien respondió que le indicaran al señor Grave Ramos que acudiera al taller para resolverle.[32] Acto seguido, el señor Ramírez Ramírez estableció que se le llamó al apelante para que comprara las piezas originales y llevara el vehículo al Taller Babilonia para instalarlas gratuitamente, a lo que el señor Grave Ramos respondió que quería los $500.00 pagados por la mano de obra.[33] Expuso que el apelante indicó que el 6 de agosto de 2019 acudiría al taller, pero no llegó hasta pasado las cuatro de la tarde (4:00 p.m.) del 7 de agosto de 2019, cuando el testigo salió como por cinco (5) minutos para probar los frenos de un vehículo que arregló.[34] El señor Ramírez Ramírez precisó que al regresar, se encontró al señor Babilonia Ildefonso sin vida.[35]

**Ivette Torres Vega**

La testigo era la esposa del señor Babilonia Ildefonso hasta su fallecimiento.[36] Su testimonio se basó principalmente sobre las cámaras de seguridad instaladas en distintas áreas del Taller Babilonia, las cuales podía observar desde su teléfono celular.

**Lizmarie Mejías Rodríguez**

La testigo afirmó que para el año 2019 era la novia del señor Grave Ramos.[37] Expuso que el apelante poseía un vehículo BMW color gris registrado a su nombre, toda vez que carecía de licencia de

---

[31] *Íd.*, líneas 20-23; pág. 90, líneas 23-30.
[32] *Íd.*, pág. 84, líneas 24-25.
[33] *Íd.*, líneas 25-34.
[34] *Íd.*, pág. 85, líneas 2-41; pág. 86, líneas 1-5.
[35] *Íd.*, pág. 86, líneas 9-32.
[36] *Íd.*, pág. 110, líneas 10-16.
[37] TPO del 18 de julio de 2022, pág. 44, líneas, 10-22.

conducir.[38] Relató que el 7 de agosto de 2019, al regresar a su residencia tras trabajar hasta las nueve de la noche (9:00 p.m.), el señor Grave Ramos la llamó para peticionar dinero y le envió un mensaje para encontrarse en el Motel Adonis de Juana Díaz.[39] La testigo expresó que estuvo en el motel con el apelante hasta la una de la mañana (1:00 a.m.).[40] Declaró que al día siguiente retornó con el apelante en el motel hasta las diez de la mañana (10:00 a.m.), momento en que culminó la estadía y llegó la policía para entrevistarla y detener al señor Grave Ramos.[41]

**Agente Pedro Soto Rodríguez**

El agente, quien trabajó para la Oficina de Servicios Técnicos de la Policía de Puerto Rico en Ponce, testificó que entre las cuatro (4:00 p.m.) o cinco de la tarde (5:00 p.m.) del 7 de agosto de 2019, recibió llamada sobre unas detonaciones y una persona muerta en la casa 229 en la calle dos (2) de la Urbanización Jardines del Caribe.[42] Relató que al acudir al lugar, donde ubicaba un taller mecánico, se encontró con una persona en el pavimento con un impacto de bala en el torso.[43] Estableció que en dicho momento los paramédicos certificaron la muerte de la persona.[44] Testificó que fotografió el área de la escena, donde encontró evidencia que marcó, levantó y entregó al Instituto de Ciencias Forenses, incluyendo unos casquillos disparados, un proyectil, una bala no disparada y un *shock absorber*.[45] Posteriormente, el testigo detalló el contenido de las fotografías que tomó en la escena.

---

[38] *Íd.*, pág. 45, líneas 19-24; pág. 46, líneas 7-8.
[39] *Íd.*, pág. 48, líneas 3-16.
[40] *Íd.*, líneas 17-25.
[41] *Íd.*, pág. 49, líneas 3-25; pág. 50, líneas 1-18.
[42] *Íd.*, pág. 71, líneas 13-19.
[43] *Íd.*, pág. 72, líneas 1-23; pág. 73, líneas 10-11.
[44] *Íd.*, pág. 73, líneas 17-22.
[45] *Íd.*, pág. 75, líneas 2-20; pág. 77, líneas 5-25; pág. 78, líneas 1-6.

**Agente Jason Rodríguez Collado**

El agente, quien laboró para la Sección Técnica de Grabaciones de la Policía de Puerto Rico, declaró que a las seis y cincuenta de la tarde (6:50 p.m.) del 7 de agosto de 2019 acudió al Taller Babilonia para extraer una copia del vídeo de unas siete (7) cámaras que grababan el exterior del lugar, cuyo monitor se encontraba en la parte posterior de la oficina.[46] Relató que dichas cámaras tenían un retraso comparado con el tiempo real por trece (13) días y unos minutos.[47] Estableció que el video mostró lo mismo que observó en el taller, más que no se apreció discontinuidad alguna.[48] Explicó que almacenó en un DVD la copia que extrajo y lo entregó al agente Tarafa Pérez.[49]

**Agente Fernando Tarafa Pérez**

El agente testificó que el 7 de agosto de 2019 participó en la investigación del asesinato en el Taller Babilonia. Identificó que en el lugar había varias cámaras de seguridad, cuyo monitor y equipo para grabar las imágenes se encontraban en la oficina del taller.[50] Relató que, al observar las imágenes en el monitor, se le instruyó al agente Rodríguez Collado que extrajera las imágenes desde aproximadamente una hora antes y después de ocurrir los hechos.[51] Puntualizó que al extraer las imágenes de las distintas cámaras de seguridad, observó al señor Grave Ramos llegar al taller con unas piezas que tiró al piso mientras el señor Babilonia Ildefonso trabajaba con el vehículo del señor Medina García.[52] Indicó que acto seguido, el apelante se dirigió hacia el señor Babilonia Ildefonso, ambos interaccionaron y se movieron hacia el frente de la oficina del occiso.[53] Testificó que observó que cuando el señor Babilonia Ildefonso se

---

[46] *Íd.*, pág. 36, líneas 1-18; pág. 37, líneas 18-25; pág. 38, líneas 9-25; pág. 39, líneas 1-24; TPO del 22 de agosto de 2022, pág. 23, líneas 7-8.
[47] TPO del 18 de julio de 2022, pág. 44, líneas 11-25; pág. 45, líneas 1-25.
[48] *Íd.*, pág. 55, líneas 9-14.
[49] *Íd.*, pág. 57, líneas 18-19.
[50] TPI del 21 de julio de 2022, pág. 210, líneas 6-23; pág. 211, líneas 8-10.
[51] *Íd.*, pág. 213, líneas 14-22; pág. 214, líneas 1-19.
[52] *Íd.*, pág. 217, líneas 9-15.
[53] *Íd.*, líneas 15-21.

dirigió hacia su oficina en dirección contraria al señor Grave Ramos, quien sacó un arma de fuego con el que le disparó por la espalda.[54] Declaró que el agente Rodríguez Collado grabó dichas imágenes de los hechos en un pendrive que descargó en la oficina del agente Tarafa Pérez y se lo entregó en un CD.[55] Afirmó que el contenido del CD, era igual a lo que presenció el día de los hechos.[56] Describió que en el vídeo apareció cuando el señor Grave Ramos llegó en su vehículo BMW color gris del cual extrajo unas piezas que colocó en el área del taller.[57] A su vez, relató que posteriormente se observó que al señor Babilonia Ildefonso dar la espalda al señor Grave Ramos, este le disparó con un arma de fuego en su espalda, se montó en su vehículo BMW y huyó.[58] Se apreció que un vehículo estilo pick-up que estacionó posterior al señor Grave Ramos se marchó detrás de él.[59]

**Agente José A. Feliciano Vega**

El testigo laboró para la División de Crímenes Cibernéticos de la Policía de Puerto Rico de Ponce. Relató que el 12 de agosto de 2019, el agente Tarafa Pérez le entregó un Galaxy S7 Active, perteneciente al señor Babilonia Ildefonso, para que realizara una extracción forense de siete (7) fotografías de vehículos arreglados en el Taller Babilonia que el occiso acostumbraba a tomar, incluyendo del vehículo BMW color gris del señor Grave Ramos.[60]

**Agente Francisco Semidei Delgado**

El testigo, quien laboró como agente de la Policía de Puerto Rico para el precinto El Tuque, declaró que el 19 de agosto de 2019, estuvo a cargo de la escena de un asesinato en el Taller Babilonia en Jardines del Caribe en Ponce.[61] Como parte de sus funciones

---

[54] *Íd.*, líneas 21-24.
[55] *Íd.*, pág. 220, líneas 15-23; pág. 221, líneas 12-24.
[56] *Íd.*, pág. 222, líneas 11-16.
[57] *Íd.*, pág. 154, líneas 21-25; pág. 155, líneas 1-8.
[58] *Íd.*, pág. 155, líneas 19-22; pág. 156, líneas 1-2.
[59] *Íd.*, pág. 156, líneas 1-2.
[60] TPO del 22 de agosto de 2022, pág. 57, líneas 9-21; pág. 58, líneas 4-24, pág. 59, líneas 9-25; pág. 60, líneas 1-4; pág. 62, líneas 10-17; pág. 94, líneas 4-32; pág. 95, líneas 1-4.
[61] *Íd.*, pág. 98, líneas 17-25; pág. 99, líneas 1-25.

investigativas, narró lo que percibió en el lugar y que refirió la investigación a la Unidad de Homicidios.[62]

**Agente Marcos Femenías Torres**

El agente, quien laboró para la División de Inteligencia Criminal de Ponce, testificó que alrededor de las cuatro y media de la tarde (4:30 p.m.) del 7 de agosto de 2019 cooperó con otros agentes de la Policía de Puerto Rico con relación a un asesinato suscitado en el Taller Babilonia.[63] Relató que acudió a la casa del señor Babilonia Ildefonso con su viuda para observar los monitores de las cámaras instaladas en el taller.[64] Estableció que el agente Rodríguez Collado se encargó de la grabación y extracción del video.[65] Puntualizó que al conseguir el número de tablilla del vehículo BMW observado en los hechos, encontró que la dueña registral residía en la Urbanización Punto Oro de Ponce.[66] Testificó que al acudir a la referida residencia, observó a una mujer que salió con un bulto y se direccionó hacia la habitación número diez (10) del Motel Garden Hills o El Garden de Juana Díaz.[67] Relató que identificó en la habitación al señor Grave Ramos, a quien arrestó por sospecha de asesinato y se trasladó hacia la Comandancia de Ponce.[68]

**Félix Ortiz Martínez**

El señor Ortiz Martínez laboró como gerente en el Garden Motel.[69] Detalló que, por cada reservación de habilitación, custodiaba una boleta de entrada que contenía información de la reservación, del cliente, de su vehículo y de las ventas en la habitación.[70] Apuntó que, para el 7 de agosto de 2019, la habitación número diez (10) del motel se alquiló a partir de las diez y diecisiete de la noche (10:17 p.m.) por

---

[62] *Íd.*, pág. 101, líneas 10-14.
[63] TPO del 23 de agosto de 2022, pág. 13, líneas 3-22; pág. 14, líneas 1-6.
[64] *Íd.*, pág. 33, líneas 5-25.
[65] *Íd.*, pág. 36, líneas 9-21.
[66] *Íd.*, pág. 39, líneas 18-25; pág. 41, líneas 18-25; pág. 42, líneas 1-20.
[67] *Íd.*, pág. 47, líneas 1-25; pág. 49, líneas 1-25; pág. 50, líneas 23-25.
[68] *Íd.*, pág. 53, líneas 2-13; pág. 54, líneas 1-24; pág. 55, líneas 1-10.
[69] TPO del 12 de septiembre de 2022, pág. 24, líneas 17-23.
[70] *Íd.*, pág. 30, líneas 2-10; pág. 31, líneas 6-18.

doce (12) horas.[71] A su vez, indicó que no se registró la hora de salida de la referida habilitación por la intervención policiaca.[72]

**Agente José M. Pérez Montes**

El agente Pérez Montes trabajó para la División de Homicidios de Ponce.[73] Declaró que para el 7 de agosto de 2019 se suscitó un asesinato en Ponce, en el que el agente Tarafa Pérez actuó como investigador.[74] Señaló que, como parte del protocolo investigativo, registró el vehículo Ford Focus de la señora Mejías Rodríguez y la habitación número diez (10) del Motel Garden Hills de Juana Díaz.[75]

**Agente Doel Santos Santiago**

El agente Santos Santiago indicó que para el 8 de agosto de 2019 laboró para la División de Servicios Técnicos.[76] Declaró que en dicho día fotografió una serie de eventos en el Motel Garden desde alrededor de las nueve y media de la mañana (9:30 a.m.).[77] Detalló que al fotografiar el baño de la habitación número diez (10) del motel, observó que dentro del desagüe del *bidet* había una pieza que, por su experiencia, sabía que era un cañón de un arma de fuego.[78] Manifestó que al tratar de extraer el cañón, este discurrió por el sifón del desagüe del *bidet*.[79] Estableció que, acto seguido observó el armazón de la pistola en el pedestal del lavamanos del baño.[80] Posteriormente, observó la corredera de la pistola dentro del tubo de la ducha.[81] Testificó que sacó la corredera, la embaló y sacó el armazón.[82] Afirmó que rompió el sifón para sustraer el cañón y embaló la evidencia.

---

[71] *Íd.*, pág. 35, líneas 4-22.
[72] *Íd.*, pág. 38, líneas 2-4.
[73] *Íd.*, pág. 61, líneas 3-10.
[74] *Íd.*, líneas 10-18.
[75] *Íd.*, pág. 62, líneas 1-25.
[76] *Íd.*, pág. 77, líneas 15-18.
[77] *Íd.*, pág. 77, líneas 15-18; pág. 78, líneas 1-20.
[78] *Íd.*, pág. 82, líneas 15-18; pág. 143, líneas 22-25, pág. 144, líneas 1-11.
[79] *Íd.*, pág. 82, líneas 23-25; pág. 83, línea 1.
[80] *Íd.*, pág. 83, líneas 5-14; pág. 144, líneas 22-25; pág. 145, líneas 3-10.
[81] *Íd.*, pág. 83, líneas 16-23; pág. 145, líneas 16-19.
[82] *Íd.*, pág. 84, líneas 2-3.

Estableció que llevó el armazón, el cañón, la corredera, dos (2) balas de 9 milímetros y un (1) cargador al Instituto de Ciencias Forenses.[83]

**Doctora Rosa Marian Rodríguez Castillo**

La doctora Rodríguez Castillo testificó que laboró como Patóloga Forense para el Instituto de Ciencias Médicas donde, entre otras cosas, realizaba autopsias.[84] Testificó que el 23 de agosto de 2019, realizó el protocolo de autopsia del señor Babilonia Ildefonso, quien tenía ocho (8) heridas de bala, localizadas en la parte inferior y superior del glúteo izquierdo, la región abdominal izquierda, el ombligo, lado superior izquierdo y derecho de la espalda superior izquierda, y en las regiones escapular y toráxica costerolateral.[85]

**Angélica María Resto Rivera**

La señora Resto Rivera declaró que era examinadora de armas de fuego en el Instituto de Ciencias Forenses.[86] Su testimonio se basó en exponer sobre la evidencia que analizó. Tras realizar una comparación microscópica y ensamblar el arma de fuego encontrada en el baño de la habitación del motel ocupada por el señor Grave Ramos y la señora Mejías Rodríguez, concluyó que todos los casquillos y proyectiles estudiados fueron disparados por el cañón de dicha arma de fuego ensamblada.[87]

**Alexander Grave Ramos**

El señor Grave Ramos estableció que era el dueño de un vehículo BMW color *charcoal grey*, el cual llevó a arreglar por varios meses al Taller Babilonia.[88] Puntualizó que el señor Ramírez Ramírez estaba interesado en su vehículo, por lo que lo dañó para que se lo vendiera a menor precio.[89] Indicó que se sentía molesto al escribirle al señor Ramírez Ramírez el mensaje de texto "me voy para allá y no

---

[83] *Íd.*, líneas 3-24; pág. 85, líneas 1-7; pág. 167, líneas 4-17.
[84] TPO del 14 de septiembre de 2022, pág. 36, líneas 3-11.
[85] *Íd.*, pág. 38, líneas 3-5; pág. 43, líneas 17-19; pág. 44, líneas 1-25.
[86] *Íd.*, pág. 29, líneas 1-8.
[87] *Íd.*, pág. 64, líneas 5-25; pág. 65, línea 1.
[88] TPO del 18 de octubre de 2022, pág. 70, líneas 8-25.
[89] *Íd.*, pág. 71, líneas 1-7.

es para buena".[90] Relató que el señor Ramírez Ramírez le respondió: "¡Ah! Pues baja pa' acá que estamos ready.", por lo que percibió que se refería a que estaba armado.[91] Precisó que dos (2) días posteriores, el 7 de agosto de 2022, cuando él y su amigo se dirigieron hacia el Taller Babilonia, su amigo le otorgó un arma de fuego que se llevó para el negocio, para "por si acaso" la necesitaba.[92] Testificó que, al adentrarse al taller con las piezas dañadas, "me bajé, me doblé y las puse, puestecita", "[n]unca las tiré ni, ni tenía actitudes ni nada".[93] Subrayó que al percatarse que el señor Ramírez Ramírez no se encontraba en el taller, salió a dialogar con el señor Babilonia Ildefonso, a quien nunca había conocido.[94] Relató que al explicarle al señor Babilonia Ildefonso que le tenía que reembolsar el dinero de la mano de obra, éste se molestó y le manifestó que como dueño del taller, debía responderle al apelante.[95] Declaró que el señor Babilonia Ildefonso alzó su voz, agitó las manos, intentó atacarlo y le expresó "tú no sabes quién yo soy", lo que el apelante percibió como una amenaza.[96] Estableció que el señor Babilonia Ildefonso le dijo "vamos a ver si tú eres bravo de verdad, cuando busque la herramienta".[97] El señor Grave Ramos concretó que interpretó el término herramienta como un arma de fuego. Atestiguó que al estar en un estado de nervios, respondió sin pensar al darle muerte al señor Babilonia Ildefonso y se fue corriendo.[98] Especificó que disparó varias veces porque aun cuando el señor Babilonia Ildefonso estaba en el piso, representaba un peligro porque no estaba muerto.[99] Particularizó que se fue hacia un motel a esperar a que su abogado le buscara una

---

[90] *Íd.*, pág. 73, líneas 14-18.
[91] *Íd.*, pág. 74, líneas 5-25; pág. 75, líneas 1-2.
[92] *Íd.*, pág. 76, líneas 1-25.
[93] *Íd.*, pág. 77, líneas 1-14.
[94] *Íd.*, pág. 78, líneas 1-25.
[95] *Íd.*, pág. 75, líneas 1-25.
[96] *Íd.*, pág. 80, líneas 1-25.
[97] *Íd.*, pág. 82, líneas 1-13.
[98] *Íd.*, pág. 86, líneas 1-24.
[99] *Íd.*, pág. 127, líneas 1-20.

fianza baja, previo a entregarse en un cuartel policiaco.[100] Subrayó que en el motel desmontó el arma de fuego porque nunca iba a revelar a quién le pertenecía.[101] Por otro lado, confirmó que no poseía licencia para portar armas, por lo que no podía tener armas.[102]

Luego de escuchar la prueba, el jurado encontró al apelante culpable por todos los cargos imputados. Así las cosas, el TPI aceptó dicho veredicto y declaró convicto al apelante.

Tras varios trámites procesales, el 13 de enero de 2023, TPI sentenció a noventa y nueve (99) años de reclusión por el delito de asesinato en primer grado a ser cumplidos de manera consecutiva con una pena de veinte (20) años de reclusión por el delito de portación y uso de armas de fuego sin licencia y diez (10) años de reclusión por disparar y apuntar armas. Asimismo, le impuso el pago de una pena especial de $300.00 por cada cargo.

Inconforme, el señor Grave Ramos acudió a este Tribunal mediante el presente recurso de apelación en el que planteó que el TPI incidió al cometer los siguientes errores:

> **1. ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL EMITIR UN FALLO DE CULPABILIDAD Y ACOGER EL VEREDICTO DEL JURADO, POR ASESINATO EN PRIMER GRADO.**
>
> **2. ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL EMITIR UN FALLO DE CULPABILIDAD Y ACOGER EL VEREDICTO DEL JURADO, CUANDO LA PRUEBA PRESENTADA ESTABLECIÓ QUE EL ACUSADO NO ACTUÓ NI A PROPÓSITO Y/O SIN CONOCIMIENTO[,] ELEMENTOS NECESARIOS PAR[A] PROBAR MÁS ALLÁ DE DUDA RAZONABLE UN ASESINATO EN PRIMER GRADO BAJO EL ARTÍCULO 93 [...] DEL CÓDIGO PENAL DE 2012, SEGÚN ENMENDADO.**
>
> **3. ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL EMITIR UN FALLO DE CULPABILIDAD, ACEPTANDO EL VEREDICTO EL JURADO, A PESAR DE HABERSE ESTABLECIDO POR PARTE DE LA PRUEBA EL ESTADO DE PERTURBACIÓN MENTAL QUE SUFRÍA EL ACUSADO PARA LA FECHA DE LOS HECHOS.**

---

[100] *Íd.*, pág. 87, líneas 22-125; pág. 88, líneas 1-25.
[101] *Íd.*, pág. 89, líneas 1-14.
[102] *Íd.*, pág. 91, líneas 1-22.

En atención a los errores planteados, procedemos a exponer la normativa jurídica atinente a este recurso.

**II.**

**A. <u>Apelación criminal</u>**

En nuestro ordenamiento jurídico, toda persona acusada tiene derecho a apelar cualquier sentencia penal que recaiga en su contra. *Pueblo v. Torres Medina*, 211 DPR 950, 959 (2023); *Pueblo v. Serbiá*, 78 DPR 788, 791-792 (1955). La apelación es un privilegio estatutario que adquirió un carácter cuasi-constitucional y forma parte del debido proceso de ley. *Pueblo v. Serbiá, supra*, pág. 792; *Pueblo v. Rivera Ortiz*, 209 DPR 402, 419 (2022); *Pueblo v. Esquilín Díaz*, 146 DPR 808, 815-816 (1998); *Pueblo v. Prieto Maysonet*, 103 DPR 102, 104 (1974). Una vez este Tribunal de Apelaciones adquirió jurisdicción, tenemos el deber de resolver el recurso de apelación en sus méritos. *Pueblo v. Colón Canales*, 152 DPR 284, 291 (2000). En tal sentido, los tribunales apelativos poseemos la facultad de examinar cualquier error de derecho cometido por el tribunal de instancia, así como cualquier asunto de hecho y derecho. *Pueblo v. Rivera Ortiz, supra*, págs. 421-422; *Pueblo v. Irizarry*, 156 DPR 780, 788 (2002). Pues, como cuestión de derecho, la determinación de probar la culpabilidad de una persona más allá de duda razonable es revisable, dado que la apreciación de la prueba es un asunto tanto de hecho como de derecho. *Pueblo v. Irizarry, supra*; *Pueblo v. Torres Medina, supra*; *Pueblo v. Rivero Lugo y Almodóvar*, 121 DPR 454, 473 (1988); *Pueblo v. Pagán Díaz*, 111 DPR 608, 621 (1981).

Al evaluar si se probó la culpabilidad de un acusado más allá de duda razonable, es norma trillada que el juzgador de los hechos está en mejor posición para apreciar y aquilatar la prueba presentada. *Pueblo v. Casillas, Torres*, 190 DPR 398, 416 (2014). Por ello, la apreciación de la prueba del juzgador de los hechos merece gran respeto y deferencia por parte de un foro apelativo. *Íd.* Así las

cosas, los tribunales apelativos solamente intervendremos con la apreciación de la prueba cuando se demuestre existencia de pasión, prejuicio, parcialidad o error manifiesto. *Íd.* pág. 417; *Pueblo v. Rivera Ortiz, supra,* pág. 422; *Pueblo v. Irizarry, supra,* págs. 788-789. Además, intervendremos cuando surjan serias dudas, razonables y fundadas sobre la culpabilidad de la persona acusada. *Pueblo v. Casillas, Torres, supra; Pueblo v. Irizarry, supra,* pág. 789. Sin embargo, "si de un análisis ponderado de la prueba desfilada ante el foro primario surge duda razonable y fundada sobre si la culpabilidad del acusado fue establecida más allá de duda razonable, este Tribunal tiene el deber de dejar sin efecto el fallo o veredicto condenatorio". *Pueblo v. Casillas, Torres, supra.*

Cuando un acusado presenta un recurso de apelación en el que plantea como error insuficiencia de la prueba, así como errores de derecho, los foros apelativos realizaremos un escrutinio de dos (2) partes. *Pueblo v. Ortiz Colón,* 207 DPR 100, 125 (2021). En primer lugar, evaluaremos la alegación de insuficiencia de prueba que, de ser meritoria, procede absolver al acusado. *Íd.* Ahora bien, si el reclamo de insuficiencia de la prueba resulta inmeritorio, procede atender los errores de derecho. *Íd.*

### B. <u>Asesinato</u>

El acto de causar la muerte de un ser humano está prohibido por nuestro ordenamiento jurídico. D. Nevares-Muniz, <u>*Código Penal de Puerto Rico,*</u> Ed. Instituto para el Desarrollo del Derecho, Inc., 2019, pág. 150. En tal sentido, el Artículo 92 del Código Penal, *supra,* sec. 5141, define el delito de asesinato como "dar muerte a un ser humano a propósito, con conocimiento o temerariamente".

Entre las seis (6) modalidades de asesinato, el inciso (a) del Artículo 93 del Código Penal, *supra,* sec. 5142, dispone que constituye asesinato en primer grado "[t]odo asesinato perpetrado por medio de veneno, acecho, tortura, estrangulamiento, sofocación o

asfixie posicional, o a propósito o con conocimiento". Además, el inciso (d) establece que se considera asesinato en primer grado "[t]odo asesinato causado al disparar un arma de fuego desde un vehículo de motor, o en un lugar público o abierto al público, ya sea a un punto determinado o indeterminado". *Íd.* Por otro lado, toda otra muerte causada a un ser humano temerariamente constituye asesinato en segundo grado. *Íd.*

El Artículo 22 del Código Penal, *supra,* sec. 5025, rige lo concerniente a los estados mentales de a propósito, con conocimiento o temeridad al momento de cometer un delito. A saber, con relación a un resultado, una persona actúa a propósito cuando su objetivo consciente es la producción de la muerte del sujeto. D. Nevares-Muniz, *op. cit.*, págs. 150-151. Es menester destacar que sólo se tiene como objetivo consciente realizar determinada acción o producir un resultado particular, como sería matar a un ser humano en el delito de asesinato. L. E. Chiesa Aponte, <u>*Derecho penal sustantivo*</u>, 2da. ed., San Juan, Ed. Publicaciones JTS, 2013, pág. 153. Una persona actúa con conocimiento con relación al resultado, cuando está consciente de que la producción del resultado es una consecuencia prácticamente segura de su conducta. D. Nevares-Muniz, *op. cit.*, pág. 151. Es decir, al actuar con conocimiento, la ocurrencia de la muerte es prácticamente segura. *Íd.* De otro lado, "[s]e trata del sujeto que actúa 'a sabiendas' de que, mediante su conducta, seguramente cometerá los elementos de un tipo penal". L. E. Chiesa Aponte, *op. cit.*, pág. 155. Cuando la persona actúa con conocimiento, aunque no desea directamente producir el delito, lo admite como necesariamente unido al resultado principal que pretendió. *Íd.* En cambio, una persona actúa temerariamente cuando está consciente de que su conducta genera un riesgo sustancial e injustificado de que se produzca la muerte del sujeto. D. Nevares-Muniz, *op. cit.*, pág. 151. El elemento mental de temeridad requiere probar que la persona es

consciente del riesgo sustancial e injustificado creado por su conducta. *Íd.* Al evaluar si el riesgo es injustificado, es necesario considerar la probabilidad que tiene la acción de producir un delito, así como las razones del actor para realizarla. L. E. Chiesa Aponte, *op. cit.*, pág. 156. En tal sentido, mientras menos razones tuviese el actor para crear el riesgo, más injustificada es su acción. *Íd.*

La utilización de un arma de fuego puede implicar razonablemente el propósito, conocimiento o la temeridad de matar o causar un daño cuya consecuencia probable sea la muerte. D. Nevares-Muniz, *op. cit.*, pág. 151. En *Pueblo v. Rivera Alicea*, 125 DPR 37, 45 (1989), el Tribunal Supremo resolvió que "[a]tacar con un arma a una persona desarmada es una actuación de la cual se puede inferirse [el propósito] de causar la muerte a dicha persona. En tales circunstancias, ello podría ser la consecuencia probable de tal acto."

### D. <u>Asesinato atenuado</u>

El Artículo 95 del Código Penal, *supra*, sec. 5144, establece que "[t]oda muerte causada a propósito, con conocimiento o temerariamente, que se produce como consecuencia de una perturbación mental o emocional suficiente para la cual hay una explicación o excusa razonable o súbita pendencia, será sancionada con pena de reclusión por un término de quince (15) años". Este tipo de asesinato se diferencia por ser producto de una súbita pendencia o una perturbación mental o emocional suficiente del actor, para la cual existe una explicación o excusa razonable o cuando se causa por una provocación de la víctima. Es decir, se trata de un delito que se consume al incurrir en un acto ilegal que se realiza a propósito, con conocimiento o temerariamente al causar una muerte, pero cuya pena beneficia al actor por existir circunstancias atenuantes que disipan la gravedad de la conducta. *Pueblo v. Guadalupe Rivera*, 206 DPR 616, 633-634 (2021); *Pueblo v. Cruz Correa*, 121 DPR 270, 279 (1988). Esto, ya que el actor no pudo reflexionar o planear el acto de

dar muerte a otro ser humano. *Pueblo v. Moreno Morales I*, 132 DPR 261, 284 (1992).

En la modalidad de perturbación mental, el juzgador de hechos debe evaluar si existió una excusa razonable para la perturbación mental o emocional que produjo la muerte, entre las que se puede evaluar si hubo una provocación por parte de la víctima. D. Nevares-Muñiz, *op. cit.*, pág. 161. Se debe considerar si una persona prudente y razonable hubiese reaccionado a la provocación de la víctima de forma violenta e intencional, pero no calculada ni preconcebida. *Pueblo v. Cruz Correa, supra*. Dicha provocación tiene que ser de tal naturaleza que haga perder el dominio de sí mismo a una persona de temperamento corriente, obligándolo a actuar por el impulso, sin la debida reflexión o sin formar un propósito. *Pueblo v. González Pagán*, 120 DPR 684, 690 (1988); *Pueblo v. Reyes Acevedo*, 100 DPR 703, 707 (1972). A saber:

> La súbita pendencia o arrebato de cólera que atenúa la responsabilidad penal del que mata a otro exige la existencia de un motivo legítimo y poderoso origina[rio del] acto cometido por el ofendido que al afectar al agente activo del delito sea suficiente para producir en su ánimo un estado de anormalidad rápido, momentáneo y pasajero; una ofuscación rápida y momentánea que afectando el estado normal de la inteligencia precipite al ofensor a obrar antes que la reflexión se imponga; un estímulo dimanante de hechos injustos que excite por modo violento el espíritu y ofusque la serenidad de la razón, que constituyan motivos realmente fundados, o sea los que a la mayoría de los hombres podrían arrebatar u obcecar. *Pueblo v. González Colón*, 110 DPR 812, 825 (1981).

En la modalidad de súbita pendencia, no se requiere una provocación previa, sino una pelea súbita en la que el actor participó sin la intención previa de matar o causar un grave daño corporal. *Íd.* No obstante, si transcurrió un lapso de tiempo durante el cual el actor recobró el dominio propio o recapacita, cometió un asesinato. *Íd.*, pág. 162. Esta norma sobre el período de enfriamiento es aplicable a la modalidad de súbita pendencia, pero no cuando existió una explicación o excusa razonable para el estado de perturbación mental o emocional. *Íd.* Esto, ya que "[s]e ha aceptado que una conducta

influenciada por una perturbación mental o emocional suficiente podría permanecer en el sub-consciente por un tiempo y aflorar posteriormente de forma inexplicable, aun cuando parezca que los ánimos se han enfriado". *Íd.*

**E. Portación y uso de armas de fuego sin licencia**

El Artículo 5.04 de la Ley de Armas, *supra*, sec. 458c, disponía lo siguiente:

> Toda persona que transporte cualquier arma de fuego o parte de ésta, sin tener una licencia de armas, o porte cualquier arma de fuego sin tener su correspondiente permiso para portar armas, incurrirá en delito grave y convicta que fuere, será sancionada con pena de reclusión por un término fijo de diez (10) años, sin derecho a sentencia suspendida, a salir en libertad bajo palabra, o a disfrutar de los beneficios de algún programa de desvío, bonificaciones o alternativa a la reclusión reconocida en esta jurisdicción, debiendo cumplir en años naturales la totalidad de la pena impuesta. De mediar circunstancias agravantes, la pena fija establecida podrá ser aumentada hasta un máximo de veinte (20) años; de mediar circunstancias atenuantes, podrá ser reducida hasta un mínimo de cinco (5) años. [...]

En el inciso s del Artículo 1.02 de la Ley de Armas, *supra*, sec. 455, la portación se define como "la posesión inmediata o la tenencia física de un arma, cargada o descargada, sobre la persona del portador, entendiéndose también cuando no se esté transportando un arma de conformidad a como se dispone en esta Ley".

Es importante particularizar que la conducta tipificada como delito no es poseer un arma de fuego, sino tenerla o poseerla sin licencia. A. Bermúdez Torres, *Los delitos especiales de Puerto Rico*, 1ra ed., Ed. Interjuris, 2008, pág. 19. *Íd.*, pág. 18. Para probar este delito, es irrelevante demostrar para qué o cómo se utilizó el arma de fuego, ya que el delito se configura por la mera portación o posesión de un arma sin licencia. *Pueblo v. Meléndez Monserrate*, 2024 TSPR 80. Por ello, "es insuficiente presentar prueba directa o circunstancial de la portación o posesión del arma ni el uso o los delitos cometidos con esta para con ello probar, además, el elemento de ausencia de licencia". *Íd.* Cónsono con ello, el Tribunal Supremo resolvió en *Pueblo v. Meléndez Monserrate, supra*, que "para que el Estado

alcance la culpabilidad de un acusado por posesión o portación ilegal más allá de duda razonable, el Ministerio Público no puede descansar únicamente en la presunción de ausencia de licencia, sino que está compelido a presentar prueba, directa o circunstancial, tanto de la portación del arma como de la falta de licencia para portarla [...]". A saber, si el Ministerio Público no cuenta con la evidencia directa de la certificación emitida por el Estado o la confesión corroborada de la persona acusada, puede probar el elemento de ausencia de licencia mediante prueba indirecta o circunstancial. *Íd.* En tal circunstancia, los tribunales podemos avalar la presunción de la ausencia de licencia, sin violentar los derechos constitucionales de la persona acusada. *Íd.*

### F. <u>Disparar o apuntar armas</u>

A tenor con el Artículo 5.15 de la Ley de Armas, *supra,* sec. 458n:

> (A) Incurrirá en delito grave toda persona que, salvo en casos de defensa propia o de terceros o de actuaciones en el desempeño de funciones oficiales o de actividades legítimas de deportes, incluida la caza, o del ejercicio de la práctica de tiro en un club de tiro autorizado:
> (1) voluntariamente dispare cualquier arma en un sitio público o en cualquier otro sitio, aunque no le cause daño a persona alguna, o
> (2) intencionalmente, aunque sin malicia, apunte hacia alguna persona con un arma, aunque no le cause daño a persona alguna. La pena de reclusión por la comisión de los delitos descritos en los incisos (1) y (2) anteriores, será por un término fijo de cinco (5) años.
> De mediar circunstancias agravantes, la pena establecida podrá ser aumentada hasta un máximo de diez (10) años; de mediar circunstancias atenuantes, podrá ser reducida hasta un mínimo de un (1) año.
> Disponiéndose que, aquella persona que cometa el delito descrito en el inciso (1) anterior, utilizando un arma de fuego y convicto que fuere, no tendrá derecho a sentencia suspendida, a salir en libertad bajo palabra, o a disfrutar de los beneficios de algún programa de desvío, bonificaciones o alternativa a la reclusión reconocida en esta jurisdicción, debiendo cumplir en años naturales la totalidad de la pena impuesta.
> Del mismo modo, cuando una persona cometa el delito descrito en el inciso (2) anterior, utilizando un arma de fuego, mediando malicia y convicto que fuere, no tendrá derecho a sentencia suspendida, a salir en libertad bajo palabra o a disfrutar de los beneficios de algún programa de desvío, bonificaciones o alternativa a la reclusión reconocida en esta jurisdicción, debiendo cumplir en años naturales la totalidad de la pena impuesta. [...]

Expuesta la normativa jurídica atinente a este recurso, procedemos a resolver.

**III.**

En el presente caso, el señor Grave Ramos plantea que la prueba presentada por el Ministerio Público en su contra no derrotó su presunción de inocencia específicamente por el delito de asesinato, por lo que entendió que no se estableció su culpabilidad más allá de duda razonable en este cargo. Esto, al alegar que no se evidenció que actuó a propósito y/o con conocimiento y por haber presentado prueba de la perturbación mental que sufría al momento de los hechos. Particularizó que de su propio testimonio surgió que nunca tuvo el propósito de matar al señor Babilonia Ildefonso, a quien no conocía. Además, que de la prueba presentada no se demostró que actuó bajo el entendimiento de que el resultado de la muerte del señor Babilonia Ildefonso era casi seguro con su conducta. Asimismo, adujo que tenía diferencias con el señor Ramírez Ramírez, por lo que la razón para estar armado respondía a la necesidad de estar protegido ante la creencia de que el mencionado mecánico igualmente estaba armado. Puntualizó que los hechos ocurrieron ante su creencia razonable de que el señor Babilonia Ildefonso iba a buscar un arma para ocasionar daño al expresar la palabra "herramienta". El apelante esbozó que en la prueba desfilada se demostró que se encontraba bajo una perturbación mental y que su actuación fue el resultado de la súbita pendencia promovida por las propias actuaciones amenazantes y agresivas del señor Babilonia Ildefonso y bajo la creencia de que sería atacado por un arma de fuego por parte del occiso. Ante ello, estableció que, a lo sumo, se podría considerar el delito de asesinato en segundo grado para el cual no se presentó prueba. Asimismo, apuntó que, mediante la prueba admitida se demostró que cometió un asesinato atenuado.

Por su parte, la Oficina del Procurador General, en representación del Ministerio Público, señaló que el señor Grave Ramos en ningún momento cuestionó ante esta Curia Apelativa las sentencia por los delitos de portación y uso de armas de fuego sin licencia, Art. 5.04 de la Ley de Armas, *supra*, sec. 458c, y disparar o apuntar armas, Art. 5.15 de la Ley de Armas, *supra*, sec. 458n. Indicó que el Ministerio Público estableció más allá de duda razonable que el apelante cometió el delito de asesinato. Esto, ya que se demostró que el señor Grave Ramos llegó molesto al taller de mecánica del señor Babilonia Ildefonso y tiró dos (2) piezas de autos en el suelo. Especificó que el apelante anunció su visita con dos (2) días de anticipación a uno de los mecánicos del taller mediante un mensaje de texto, en el que se reflejó su propósito de no ir para nada bueno. Por otro lado, manifestó que tras discutir con el señor Babilonia Ildefonso y mientras este caminó hacia su oficina dándole la espalda, el apelante le disparó varias veces. Singularizó que de la prueba visual presentada y del propio testimonio del apelante se reflejó que aun después del señor Babilonia Ildefonso caer al piso, el señor Grave Ramos le disparó en varias ocasiones, demostrando que lo mató a propósito.

Tras un análisis sereno y objetivo de la totalidad del expediente ante nuestra consideración, concluimos que el Ministerio Público demostró más allá de duda razonable que el señor Grave Ramos cometió el delito de asesinato en primer grado contra el señor Babilonia Ildefonso. De la prueba presentada y creída por el jurado, surge que el 5 de agosto de 2019, el apelante le envió un mensaje de texto al mecánico de su vehículo, el señor Ramírez Ramírez, reclamándole la devolución del dinero de la mano de obra. En dicho texto, el señor Grave Ramos estableció "Mañana voy para allá y no es para nada bueno", mensaje que el señor Ramírez Ramírez respondió con "¡Ah! Pues baja pa' acá que estamos ready". Dos días después, el

7 de agosto de 2022, el apelante acudió al Taller Babilonia en compañía de un amigo que previamente le había otorgado un arma de fuego para que se la llevara al negocio, "por si acaso" la necesitaba. Los testigos declararon que al llegar al taller el señor Grave Ramos estaba alterado, molesto y gritando, más tiró al piso dos (2) piezas de su automóvil. Sin embargo, el propio apelante declaró que entró al taller mecánico sin actitudes y que se dobló para colocar las referidas piezas de manera "puestecita". Posteriormente surgió que el señor Babilonia Ildefonso y el señor Grave Ramos estaban dialogando con movimiento de las manos. El apelante declaró que el señor Babilonia Ildefonso estaba alterado, intentó atacarlo y le expresó "tú no sabes quién yo soy", "vamos a ver si tú eres bravo de verdad, cuando busque la herramienta". El señor Grave Ramos declaró que interpretó el término herramienta como un arma de fuego y que al sentirse amenazado y con nervios, le dio muerte al señor Babilonia Ildefonso y huyó. De la TPO se desprendió que el apelante le disparó en varias ocasiones al señor Babilonia Ildefonso hasta que cayó al suelo y posteriormente continuó disparándole, ya que entendía que no estaba muerto porque se seguía moviendo. En el contrainterrogatorio del Ministerio Público, el apelante expresó lo siguiente:

> **[Fiscal]** ¿Y le da la espalda?
> **[Señor Grave Ramos]** Sí.
> **[Fiscal]** ¿Y usted saca la pistola?
> **[Señor Grave Ramos]** Sí
> **[Fiscal]** En vez de irse, ¿decidió sacar la pistola? ¿sí o no?
> [...]
> **[Señor Grave Ramos]** Sí
> **[Fiscal]** Y ahí usted le disparó. Usted le disparó, ya no había peligro para usted cuando estaba en el piso, ¿verdad que no?
> **[Señor Grave Ramos]** Sí
> **[Fiscal] ¿Qué peligro había en una persona tirada en el piso, con esos tiros en la, en la espalda?**
> **[Señor Grave Ramos] No estaba muerto.**
> **[Fiscal]** "No". O sea, que, cuando él estaba boca arriba, ¿no fue para matarlo cuando, que usted le disparó?
> **[Señor Grave Ramos] Se seguía moviendo** [Énfasis nuestro].[103]

---

[103] TPO del 18 de octubre de 2022, pág. 126, líneas 18-23; pág. 127, líneas 2-16.

Al evaluar estos hechos perpetrados por el señor Grave Ramos con relación al delito de asesinato en primer grado, según tipificado en el Artículo 93 del Código Penal, *supra*, sec. 5142, determinamos que existe prueba suficiente para establecer más allá de duda razonable que se configuraron todos los elementos del delito por el que resultó convicto. Es decir, el señor Grave Ramos le dio muerte al señor Babilonia Ildefonso a propósito y con conocimiento mediante varios disparos con un arma de fuego. Del propio testimonio del apelante surgió que, aun cuando el señor Babilonia Ildefonso se encontraba indefenso de espaldas al apelante, en vez de irse del negocio, decidió sacar el arma de fuego y dispararle hasta que el occiso cayó al suelo. Como si fuera poco, ya cuando estaba tirado en el suelo, el señor Grave Ramos continuó disparándole al señor Babilonia Ildefonso, **ya que aún no estaba muerto**. Dicha acción demostró claramente que el objetivo consciente del señor Grave Ramos fue producir la muerte del occiso. En este caso, con su acción de disparar en varias ocasiones al señor Babilonia Ildefonso con un arma mortífera aun cuando cayó al suelo a consecuencia de los primeros disparos, y ante la pretensión de que el occiso dejara de moverse, sin lugar a duda, evidencian que el deseo del apelante era producir el delito de asesinato.

Por todo lo anterior, concluimos que resulta inmeritorio el reclamo de insuficiencia de la prueba del señor Grave Ramos. No erró el jurado al encontrar culpable al señor Grave Ramos unánimemente por el delito de asesinato en primer grado, ni el TPI al imponer la correspondiente sentencia.

Al considerar los elementos del delito de asesinato atenuado, no encontramos prueba alguna que nos demuestre una excusa razonable para la perturbación mental que alegó sufrir el señor Grave Ramos al momento de dispararle al señor Babilonia Ildefonso. El hecho de que el señor Babilonia Ildefonso expresara que iba a buscar

una herramienta dentro del contexto de un taller de mecánica no es suficiente para crear una provocación capaz de lograr una reacción violenta, intencional, pero no calculada ni preconcebida en una persona de temperamento corriente, obligándolo a matar sin la debida reflexión o sin formar un propósito de dar muerte a un ser humano. La prueba "*self serving*" presentada por el apelante, la cual fue aquilatada por los integrantes del jurado, fue insuficiente para demostrar que existió un incidente súbito en el que el señor Grave Ramos actuó sin el propósito previo o con el conocimiento de matar o causar un grave daño corporal. Por el contrario, la prueba establece que días previos a ocurrir los hechos, el apelante avisó en un tono amenazante que llegaría al taller de mecánica, donde no iba a ocurrir "nada bueno". En segundo lugar, previo a entrar al negocio y de que dialogara con el señor Babilonia Ildefonso o que conociera la actitud del occiso, el apelante guardó en su pantalón el arma de fuego que le otorgó su amigo para "por si acaso" la necesitaba. En tercer lugar, el hecho de que el occiso se dirigiera hacia su oficina en búsqueda de una herramienta, sin más, no justificaba, para una persona razonable, el entrever que el occiso se disponía a buscar un arma. Sin embargo, el señor Grave Ramos, si portaba un arma, lo que, unido a su mensaje de texto anterior denota un estado mental que lo predisponía a utilizar la misma. Por último, según la prueba el occiso caminaba delante del apelante, y le daba la espalda. En esta circunstancia, nada impedía que el apelante, en vez de ultimar al señor Babilonia, simplemente retrocediera y abandonase el lugar.

Así, en virtud de lo anteriormente expuesto y cónsono con la normativa jurídica previamente esbozada, resolvemos que el TPI no cometió los errores señalados por el señor Grave Ramos. Por tanto, procede confirmar las sentencias apeladas.

**IV.**

Por los fundamentos que anteceden, se confirman los dictámenes apelados.

Lo acuerda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones